154 So.2d 400

**STATE of Louisiana**

**v.**

**Jim GARRISON.**

No. 46686.

June 4, 1963.

Rehearing Denied June 28, 1963.

Donald V. Organ, Louis P. Trent, New Orleans, for appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., John E. Jackson, Jr., Asst. Atty. Gen., Robert S. Link, Jr., Asst. Atty. Gen., for appellee.

HAMLIN, Justice.

The defendant, Jim Garrison, appeals from his conviction of the offense of Defamation[1] (LSA–R.S. 14:47) and his sentence to pay a fine of $1,000.00 or, in default of payment of said fine, to serve four months in the Parish Prison.

The Bill of Information charging the defendant with the offense of defamation recites:

"Jack P. F. Gremillion, Attorney General for the State of Louisiana, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one Jim Garrison late of the Parish of Orleans, on the 2nd day of November in the year of Our Lord, one thousand nine hundred and sixty-two with force and arms in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, did wilfully, unlawfully and maliciously defame each, George B. Platt, Judge of Section 'B', Criminal District Court for the Parish of Orleans and the presiding judge thereof, and one Malcolm V. O'Hara, Judge of Section 'A' of the Criminal District Court for the Parish of Orleans, one Edward A. Haggerty, Jr., Judge of Section 'C', Criminal District Court for the Parish of Orleans, one Thomas M.

[1]. "Defamation is the malicious publication or expression in any manner, to anyone other than the party defamed, of anything which tends:
 "(1) To expose any person to hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse; or

 "(2) To expose the memory of one deceased to hatred, contempt, or ridicule; or
 "(3) To injure any person, corporation, or association of persons in his or their business or occupation.
 "Whoever commits the crime of defamation shall be fined not more than three thousand dollars, or imprisoned for not more than one year, or both." LSA–R.S. 14:47.

Brahney, Jr., Judge of Section 'D' of the Criminal District Court for the Parish of Orleans, one J. Bernard Cocke, Judge of Section 'E', Criminal District Court for the Parish of Orleans, one Oliver P. Schulingkamp, Judge of Section 'F', Criminal District Court, for the Parish of Orleans, one Shirley G. Wimberly, Judge of Section 'G', Criminal District Court for the Parish of Orleans, and Bernard J. Bagert, Judge of Section 'H', Criminal District Court for the Parish of Orleans, which said judges constitute all the entire bench of the Criminal District Court for the Parish of Orleans, and did publish and express in the public press of the City of New Orleans to persons other than the parties defamed which said publication and expressions are recited herein below of certain things which tend to expose to hatred, contempt and ridicule and deprive such persons of their benefit of public confidence and social intercourse. The said publication and expressions being contained in the following news item reproduced from the New Orleans States-Item, (an afternoon daily newspaper published in the City of New Orleans, Parish of Orleans, published on November 2nd, 1962 which reads as follows, to-wit:

" 'TEXT OF GARRISON STAND ON JUDGES

" 'The statement by District Attorney Jim Garrison on his feud with the criminal district court judges follows:

" 'Apparently the judges have called in all their reserves.

" '(A reference to the joint meeting of all criminal court judges today.)

" 'Whatever their resulting statement turns out to be, I doubt if the statement. ,.:
facts will be much more accurate than those in Judge (William J.) O'Hara's statement.

" 'I will cite some glowing examples of misrepresentation of facts.

" 'First of all is the attempt made to counterattack by imputing to this office the responsibility for the overcrowded conditions of the Parish Prison.

" 'Judge O'Hara makes the fantastic implication that somehow the system of operation of my office has created this condition. The short reply to this untruth is that the Parish Prison was vastly overcrowded the day we were sworn in.

" 'There was not only a backlog of untried cases then * * * there has been for years.

" 'For example, the judge admits in his own statement that the (Leon D.) Hubert office inherited a backlog of 3500 cases. When we came into office in May, the backlog had risen to approximately 4600 cases.

" 'Inasmuch as the judges have been the only continuing caretakers of the criminal courts operations over the years, it is pretty obvious where the real responsibility lies for the revised backlog of untried cases.

" 'District attorneys come and go every four years but the judges and the backlog always seems to be here.

" 'Furthermore, I am sure that Judge O'Hara knows that no district attorney's office in years has pushed more cases to trial than we have in our first six months of office.

" 'We have prosecuted approximately 40 jury trials already—despite the fact that the winter term of the courts has just begun.

" 'An objective study by an outside agency will reveal that this is at least as many trials as were held the last two years prior to our arrival.

" 'To go on to another misrepresentation, Judge O'Hara has made the incredible statement that we have pulled our investigators away from the courts. The truth is that our investigators are with the trial assistant, invariably within arm's reach of the assistant, in full sight of the judge in every courtroom throughout every trial.

" 'Obviously this is nothing more than a petulant slap at our use of investigators to uncover vice conditions in the city—an operation with which the judges have shown a remarkable lack of sympathy.

" 'As a matter of fact, so opposed have the judges been to our vice investigations that they completely blocked us off from our Bourbon Street investigations of B-drinking and other forms of vice.

" 'This was accomplished by the judges tying the purse strings of the district attorney's fines and fees and informing me that no further money could be used in the investigation of any vice conditions.

" 'The judges have specifically directed that the district attorney's office "should not investigate anything" and informed me that they would allow me to use no further money from my large fines and fees—presently $40,000—for any form of vice investigation.

" 'In certain areas where we have spent borrowed money to keep operating against vice—in major handbook operations as well as in B-drinking cases—the judges have instructed me that this money will not be replaced out of fines and fees. I must pay this out of my own pocket.

" 'Again the message from the judges is clear. They do not want the district attorney's office to investigate anything.

" 'Interestingly enough, had I let them stop me in August as they attempted to do, I would not have been able to keep the pressure on the Canal Street B-joints, which ultimately resulted in the closing of all of them.

" 'I succeeded in keeping up the pressure on these places, despite the judges' tying of the purse strings, by my personal loan from the Bank of New Orleans.

" 'The judges have now made it eloquently clear where their sympathies lie in regard to aggressive vice investigations by refusing to authorize use of the DA's funds to pay for the cost of closing down the Canal Street clip joints * * * closed them, despite their (the judges') obvious attempts to block me, they now seek to slap the DA on the wrist by making him pay for this successful operation out of his pocket.

" 'Again the message is clear: "Don't rock the boat, son. You are not supposed to investigate anything."

" 'This raises interesting questions about the racketeer influences on our eight vacation-minded judges. This is a matter regarding which I will have [much [2]] more to say a little later.

" 'To go on to another misrepresentation of Judge O'Hara's statement, I am sure that he well knows that we did not throw out the trial preparation system of Mr. Hubert.

" 'That was junked four years ago by the preceding DA's office and there was no comment by Judge O'Hara about its disappearance throughout the four years.

" 'As a matter of fact, this office gives special attention to the preparation of trial and has adopted a number of the excellent trial preparations of the Hubert era.

" 'To give a specific example, our office now is in the process of printing for distribution to every criminal

---

2. The word "much" is contained in the newspaper article.

defense attorney and every court the trial docket for the month to come.

" 'Our setting of particular cases on particular dates is so arrived at to avoid such conflicts as having cases in different courts by defendants or an attorney on the same day.

" 'Interestingly enough, this program was abandoned by the previous DA's administration, and again there was not a word from Judge O'Hara.

" 'O'Hara has now developed—subsequent to his retirement—a concern for the efficient operation of the trial dockets.

" 'Actually, the time for Judge O'Hara to be active in his concern for the district attorney's office was during the preceding four years when there was a complete breakdown of vice prosecution and prosecution of cases in every area.

" 'So complete was this breakdown that in the last several years there were almost no trials of any kind for commercialized vice. The judge at no time expressed any concern for this breakdown of the prosecution office.

" 'The first discernible interest on their part with regard to the district attorney's handling of vice cases arrived the past summer when it be-

came apparent that this office was achieving success in its effort to eliminate the B–drinking racket in New Orleans.

" 'This is when, to my astonishment, I suddenly received instructions—through Judge O'Hara himself, speaking for the rest of the judges—that I could no longer spend any money out of fines and fees for anything.

" Since this was in August—there was not to be an en banc meeting until October when all the judges returned from their vacations—this would have had the effect of blocking our vice investigations. This is when I borrowed money from the bank and continued to investigate B-drinking in spite of the judges.

" 'If the judges would show half as much interest in solving dangerous overcrowded conditions of the Parish Prison, and this overcrowding has been present for years not just the last few weeks, as they have shown in their successful attempts at completely blocking the anti-B-drinking operations of my office, the Parish Prison problem would be ended overnight.

" 'The efficiency and dispatch with which the judges of the present court stopped my undercover investiga-

tions of B-drinking and the resolve which they demonstrated in their uniform opposition to any continued vice investigation by this office would gladden the heart of any efficiency expert.

" 'It is unfortunate that there is no comparable interest on their part with regard to the problem of inmates awaiting trial month after month in the Parish Prison.

" 'It is incredible that in this country in 1962 that a man could wait 19 months before his case is disposed of, during which period the judge enjoyed over 300 days vacation.

" 'There are now approximately 520 prisoners awaiting trial out of a prison population of 758.

" 'I think this is an outrageous condition which should be answered not by petulant words by the judges but by action—to immediately increase the number of trial days of this court so that the men can be brought to a speedy trial.'

"contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.

> "(Signed) Jack P. F. Gremillion
> "Attorney General for the
> State of Louisiana"

The record reflects that the statement or expression set forth in the foregoing Bill of Information was given by the defendant, Jim Garrison, District Attorney for the Parish of Orleans, to the New Orleans press and published by said press, after the judges of the Criminal District Court refused to sign orders for the payment of funds out of the Fines and Fees Fund for expenditures of the District Attorney. The District Attorney had taken no legal steps to compel the judges to sign said orders.

The Bill of Information, supra, was filed shortly after defendant's statement was published.

On November 13, 1962, the Supreme Court of the State of Louisiana appointed Honorable William H. Ponder, Judge of the Eleventh Judicial District Court, to sit as Judge ad hoc for the Criminal District Court for the Parish of Orleans for the trial of the instant cause, No. 177–418 of the Docket of the Criminal District Court for the Parish of Orleans, entitled, "State of Louisiana versus Jim Garrison." Article VII, Section 12, of the LSA–Constitution of 1921. LSA–R.S. 15:307. The order was effective immediately. The Presiding Judge of Section "C" of the Criminal District Court, to which section this case had been assigned, recused himself, and Judge Ponder ascended the Bench for the commencement of trial.

The defendant thereafter filed a Motion to Recuse, alleging:

"That the Honorable P. F. Jack Gremillion, Attorney General for the State of Louisiana, who prosecutes this case in the name of the State of Louisiana, has publicly stated in the public press and otherwise, his belief that the integrity of the entire judiciary of the State of Louisiana is an issue in this case and has thus announced his intention of making the integrity of the Louisiana judiciary an issue in the trial thereof; that the said utterances and the proposed trial have had and will have the effect of making the entire judiciary of the State of Louisiana an interested party to this case within the meaning of the recusation statutes of the State of Louisiana.

"That the constitutional and statutory provisions of the State of Louisiana authorizing the arbitrary appointment by the Louisiana State Supreme Court of a trier of fact for a particular case, are unconstitutional and null and void as violative of the due process provisions of the Fourteenth Amendment, and that the appointment of the said Honorable William H. Ponder, under color of authority of the said provisions of the Louisiana State Constitution and Revised Statutes, is therefore null and void and of no force and effect."

The trial judge denied the above Motion to Recuse, and Bill of Exceptions No. 1 was reserved to his ruling.

In this Court appellant argues that:

" * * * the Honorable William H. Ponder prejudged this case, and had *already*—subconsciously—found the accused guilty of defamation when the trial began on January 21, 1963. In support of this contention we call the Court's attention to the fact that from the first moments of the trial, and continuously thereafter during the many days which the trial lasted, Judge Ponder referred in no uncertain terms to the per curiams which he would write in this case. No citation of authority is needed to prove that, once jeopardy has set in, per curiams are only written by a trial judge in the event the accused is found guilty and appeals from his judgment of conviction. * * *"

Appellant further states:

"It is the position of the accused that whether his guilt or innocence was to be determined by a judge or a jury, he was not provided with due process of law if the trier of fact was subject to arbitrary selection, particularly by the judiciary of the State of Louisiana. Even without the judiciary's interest in this matter, such an appointment would not provide a defendant in a misde-

meanor case with due process since the logical extension of such a procedure could be to give the Supreme Court the power to appoint the jury in a felony matter. It is submitted that only a jury properly drawn, selected and empaneled, or a judge who has been duly elected to an office specifically empowered to decide guilt or innocence in criminal cases in a particular jurisdiction provides an accused with due process of law.

\*　　\*　　\*　　\*　　\*　　\*

"In the instant case the Criminal District Court Judges took a most active and vigorous part in the prosecution of this accused. The integrity of the entire state judiciary was threatened and questioned by the widely publicized opinion of the Attorney General. In the minds of the general public this case became the case of the District Attorney versus the Judiciary. A verdict for the defendant would have condemned the judiciary, particularly in the eyes of the public. The judiciary could not stand in a position of the accusors, the judge, the jury and the executioners and give Jim Garrison a constitutional trial."

3. "The causes for which any judge in any criminal case shall be recused, shall be as follows: (1) His being interested in the cause; but in any cause in which the state, or one of its political subdivisions, or any religious corporation, is

■　Article VII, Section 10, of the Louisiana Constitution of 1921, provides that the Supreme Court of the State of Louisiana shall have control of and general supervision over all inferior courts. Article VII, Section 12, of the Louisiana Constitution of 1921, empowers this Court to make an appointment such as was made herein. The appointment was therefore not in violation of any of the provisions of the State Constitution. We find no federal prohibition with respect to an appointment such as the instant one; it therefore follows that defendant's complaints with respect to a violation of the Fourteenth Amendment to the United States Constitution are without merit. The record is barren of any showing that the defendant suffered prejudice by the refusal of the trial judge ad hoc to recuse himself. LSA–R.S. 15:557. Defendant's arguments that he was deprived of due process of law, and that the Bill of Information should be dismissed because there is no proper judge in the State of Louisiana to try him, are also without merit.

LSA–R.S. 15:303 [3] sets forth the causes for which any judge in any criminal case shall be recused; none of these causes are applicable to the instant trial judge. A

interested, the fact that the judge is a citizen of the state or a resident of the political subdivision, or pays taxes thereto, or that he is a member of the religious corporation, shall not constitute a ground for recusation. (2) His being the spouse

reading of the Motion to Recuse reflects that it contains general statements of conclusions, which do not constitute grounds for recusation. Under the circumstances, the trial judge could rule upon the Motion to Recuse, and he acted properly in ruling upon it.

"The jurisprudence of this State is well-settled that if the allegations of the petition for the recusation of a judge are mere general statements of conclusions that the judge is prejudiced and biased against or hostile to the defendant because of personal or political reasons, or that if the petition does state facts which, if proved, would not constitute a legal ground for recusation, the judge who is sought to be recused may himself overrule the motion and need not refer it to another judge for trial. * * *" State v. Doucet, 199 La. 276, 5 So.2d 894. See, State v. Laborde, 214 La. 644, 38 So.2d 371.

As stated supra, defendant argues that the trial judge had prejudged this case, and had *already*—subconsciously—found the accused guilty of defamation when the trial

began on January 21, 1963. Defendant cites, among others, the following remarks of the trial judge:

" * * * The Court has sustained any statements made after the objection has been made. It will be more fully covered in the per curiam of the Court. * * *"

" * * * The Court will set forth more fully its legal reasons for this ruling on these bills of exception in its per curiam, which will be attached to and made part of the bill of exceptions."

" * * * the Court allows it to be admitted, and the Court will assign its reasons for the admission in a per curiam, which will be attached to the Bill of Exception, * * *"

We do not agree with counsel's argument;[4] the record is replete to the effect that the trial judge did not prejudge this matter. It is clear to us that an experienced judge such as Judge Ponder (the trial judge herein) meant that he would amplify his rulings in his per curiams in the event of

of the accused or the party injured or one of the attorneys; his being related to the accused or to the party injured or to the spouse of the accused or the party injured within the fourth degree, or to one of the attorneys or to the spouse of one of the attorneys within the second degree. (3) His being a material witness in the cause. (4) His having been employed or consulted as an attorney in

the cause or his having been associated with an attorney during the latter's employment in the cause. (5) His having performed any judicial act in the cause in any other court." LSA–R.S. 15:303.

4. Defendant states in brief, "Of course we realize that there was no conscious prejudging of Garrison's case by Judge Ponder. * * *"

an appeal. Before rendering judgment, he aptly stated:

"* * * So in referring to my *per curiam*, the question of the *per curiam*, throughout the trial of the case, I want to qualify that to the extent that I intended, and if there be—there was no pre-judging of the case, but if there were intended to be reserved a bill of exception at any time during the trial of the case, my per curiam would further amplify my reasons."

Bill of Exceptions No. 1 is without merit.

Bill of Exceptions No. 2 was reserved to the trial court's overruling of defendant's application for a Bill of Particulars. The application set forth the following questions:

"1.

"What are the exact words, phrases and/or sentences of the statement set forth in the Bill of Information that are alleged to be defamatory as to the judges named in the said Bill of Information?

"2.

"What are the exact words, phrases and/or sentences contained in the said quoted statement that tend to expose to hatred, contempt or ridicule the judges of the Criminal District Court named in the said Bill of Information, or to deprive them of their benefit of public confidence and social intercourse?

"3.

"Does the State contend that the statement of the defendant set forth in the Bill of Information contains any allegations of fact which are not true?

"4.

"If the answer to Paragraph 3 above is in the affirmative, please set forth the exact words, phrases, and/or sentences containing allegations of fact which are alleged by the State to be untrue."

The State answered the above questions as follows:

"I.

"The State will rely upon the entire article as quoted in the Bill of Information.

"II.

"The State will rely upon the entire article as quoted in the Bill of Information.

"III.

"The State will contend that the statement of the defendant set forth in the Bill of Information constitutes malice in law and also malice in fact.

"IV.

"The entire expression and publication as quoted in the Bill of Informa-

tion will be used as the basis on the trial as the alleged violation of the statute. The State will also prove the allegation of fact that the said statement was made and published by the said defendant on the date set forth in the indictment."

In this Court defendant contends that:

"In failing to order the State to tell this accused the exact words, phrases and sentences in the November 2 statement which the State contended were defamatory or untrue, the trial judge abused the discretion vested in him by Article 288 of the Code of Criminal Procedure,[5] [LSA–] R.S. 15:288, to the detriment and disadvantage of the accused. See State v. Butler, 229 La. 788, 86 So.2d 906.[6] The statement which forms the basis of this prosecution is quite long, and the trial court

placed an unfair burden on this accused when it denied the Application."

▮▮▮ Initially it is to be observed that when a party is charged with criminal defamation, "The words contained in the statement are to be given their ordinary meaning unless it is shown that they were capable of being used and were in fact used with a different meaning. The meaning of the statement is to be determined from an examination of the statement as a whole. The statement is to be interpreted in the light of the surrounding circumstances, and words apparently innocent may be shown to have been defamatory in fact." Wharton's Criminal Law and Procedure, 1957, Volume II, Section 884, Page 750. In State v. Lambert, 188 La. 968, 178 So. 508, (a prosecution in which the defendant was charged with libel), we held that in analyzing a document and determining its legal

---

5. "Defects in indictments can be urged before verdict only by demurrer or a motion to quash, and the accused is not entitled to any bill of particulars as to the subject-matter charged in the indictment, but the trial judge may, in his discretion, require the district attorney to file in the case such data as, in the opinion of the judge, may be sufficient."

6. In State v. Butler, 229 La. 788, 86 So.2d 906, the defendant was charged with unlawfully possessing, having under his control, selling, and delivering marijuana. The State refused to answer his application for a bill of particulars. Pertinent information sought was the names of the persons to whom defendant was alleged to have sold and to have delivered the marijuana. This Court granted

defendant a new trial, stating, "However, while it is discretionary with the trial judge, he cannot arbitrarily refuse to order the State to furnish 'essential particulars.' That is exactly what the trial judge refused to do in this case." In a per curiam written on refusal of an application for rehearing, we stated that this Court must decide each case on the issues presented; and, in the matter involved, after considering the language of the bill of information, we said that we were of the opinion that the accused was entitled to the information sought so that he could adequately prepare his defense, and that in refusing to order the State to furnish the information the trial judge abused his discretion.

effect, the document must be considered as a whole. In interpreting articles of the Louisiana Criminal Code, LSA–R.S. 14:3 provides that the articles of the Code cannot be extended by analogy so as to create crimes not provided for therein; and, in order to promote justice and to effect the objects of the law, all of the provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

■ Under the circumstances of this case, we find that the State's answer (Art. IV, supra), to the effect that the entire expression and publication as quoted in the Bill of Information would be used as the basis on the trial as the alleged violation of the statute, was sufficient to enable the defendant to adequately prepare his defense. Additionally, the State informed the defendant (Art. III, supra) that it would contend that the statement of the defendant set forth in the Bill of Information constituted malice in law and also malice in fact. We conclude that there was no need for the State to further particularize exact words, phrases, and sentences.

"* * * The State is not required to reveal in advance of the trial the facts on which it will rely in seeking a conviction." State v. Mills, 229 La.

758, 86 So.2d 895, Cert. denied, 352 U.S. 834, 77 S.Ct. 51, 52, 1 L.Ed.2d 53.

■ The proper function of a Bill of Particulars is to inform the accused in greater detail of the nature of the crime of which he is charged. State v. Simpson, 216 La. 212, 43 So.2d 585, Cert. denied, 339 U.S. 929, 70 S.Ct. 625, 94 L.Ed. 1350. We find that the answer of the State in the instant case performed the proper function of giving the defendant the details he required.

The trial judge exercised the discretion vested in him by LSA–R.S. 15:288 (Footnote 5, supra). We find that he did not abuse his discretion; we also find that the defendant did not suffer prejudice by the trial judge's overruling of the Motion for a Bill of Particulars. LSA–R.S. 15:557.

"The complaint is without substance. The granting or refusal of a bill of particulars addresses itself to the sound discretion of the trial judge. State v. Augusta, 199 La. 896, 7 So.2d 177; Articles 235, 288, Code of Criminal Procedure. * * *" State v. Poe, 214 La. 606, 38 So.2d 359.

"We reiterate that the matter of furnishing a Bill of Particulars rests largely in the discretion of the trial judge, and his discretion will not be disturbed unless there is error in the ruling complained of to the detriment or disadvantage of the accused. * *'"

State v. Butler, 229 La. 788, 86 So.2d 906.

Bill of Exceptions No. 2 is without merit.

Bill of Exceptions No. 3 was reserved to the trial court's overruling of defendant's Demurrer and Motion to Quash, which recites:

" * * * the said Information and the matters therein are, as therein alleged and set forth, not sufficient in law to compel him, the said Jim Garrison, to answer thereto, for the following reasons, to-wit:

"1.

"That the statement set forth in the Bill of Information attributed to the defendant herein, Jim Garrison, contains no allegations of fact which are defamatory, or which could through any reasonable interpretation, tend to expose to hatred, contempt or ridicule or to deprive of their benefit of public confidence and social intercourse any of the judges of the Criminal District Court therein named as the persons defamed.

"2.

"That the statement set forth in the Bill of Information affirmatively reveals itself to be a comment on the conduct of persons in respect to public affairs and as such protected by a qualified privilege; that despite the allegation of malice contained in the said Bill of Information herein, the statement attributed to the defendant affirmatively shows the absence of malicious motive; that the said statement shows the utterances contained therein to be in response to a previous public criticism by one Judge William O'Hara, and in defense of the defendant's performance of his duties as District Attorney in combating organized vice operations in the City of New Orleans.

"3.

"That to hold the statement set forth in the Bill of Information to be a violation of [LSA–]Revised Statute 14:47 or to interpret the said R.S. 14:47 defining the crime of defamation so as to include within the scope thereof the statement set forth in the Bill of Information in this case would violate the provisions of the First Amendment of the Constitution of the United States prohibiting abridgment of freedom of speech as the said amendment is made applicable to the State of Louisiana through the Fourteenth Amendment of the United States Constitution."

In this Court defendant argues:

"1. *The criminal statutes defining defamation under which the charge against Garrison has been brought, Articles 47–50 of the Louisiana Criminal Code, [LSA–] R.S. 14:47–50, as well as*

that portion of Article 1, Section 3, of the Louisiana Constitution authorizing such laws, are absolutely null and void in that they are prohibited by the First Amendment to the United States Constitution, guaranteed to citizens of the states by the Due Process Clause of the Fourteenth Amendment to that Constitution.

"A. Any law which in any fashion curtails freedom of expression violates the First Amendment to the Federal Constitution.

"B. In the alternative, these statutes are phrased in such broad general terms that they cover activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press, and for this reason Articles 47-50 are void.

"C. Articles 47-50 fail to provide the procedural safeguard of a trial by jury which is essential to the protection of First Amendment rights.

"2. In the alternative it is contended that in the event Articles 47-50 defining the crime of defamation, [LSA-] R.S. 14:47-50, are found not to violate the Federal Constitution, still the accused's conviction of defamation for the statements set out in the bill of information filed herein deprives him of his right to freedom of expression, guaranteed to citizens of Louisiana by the Due Process Clause of the Four-teenth Amendment and the First Amendment to the United States Constitution."

Defendant also contends that the trial judge committed error in his refusal to apply the "Clear and Present Danger" test to this prosecution.

In his per curiam, the trial judge states that he would not pass upon defendant's first contention that the statement set forth in the Bill of Information was not defamatory so as to bring it within the statutory provisions of LSA-R.S. 14:47, because he did not think that the contention was properly presented on a Motion to Quash. He said that qualified privilege and malice were involved, and that proof thereof would require evidence, particularly on the issues of truth or falsity.

In State v. Lambert, 188 La. 968, 178 So. 508, we said, "The question as to whether a communication is privileged involves questions of fact as well as of law. State v. Whitmire, 166 La. 195, 116 So. 849. Where the facts are not disputed the question of privilege becomes one of law. Odgers on Libel and Slander, 2d Ed., § 183, p. 216; Newell on Slander and Libel, 4th Ed., § 345, p. 385." In State v. Masino, 214 La. 744, 38 So.2d 622, we held that evidence may be taken on a Motion to Quash an indictment, but evidence is limited to procedural matters and may not include a defense on the merits.

In the publication set forth in the Bill of Information, the defendant states, among other things, that, " * * * it is pretty obvious where the real responsibility lies for the revised backlog of untried cases"; that, " * * * so opposed have the judges been to our vice investigations that they completely blocked us off from our Bourbon Street investigations of B-drinking and other forms of vice"; that, "This raises interesting questions about the racketeer influences on our eight vacation-minded judges. * * *"; that, " * * * a man could wait 19 months before his case is disposed of, during which period the judge enjoyed over 300 days vacation"; and that, "There are now approximately 520 prisoners awaiting trial out of a prison population of 758." These are all assertions of fact which require the hearing of evidence.

We therefore find that the trial judge could not have passed upon the contention raised by the defendant in the first paragraph of his Demurrer and Motion to Quash without hearing evidence on matters other than procedural ones; under the jurisprudence, supra, he was correct in his ruling.

In his per curiam, the trial judge further states that he would not pass upon defendant's second contention that the Bill of Information is a comment on the conduct of persons in respect to public affairs and as such protected by a qualified privilege, because, " * * * the defendant would necessarily have to have a reasonable belief as to the truth of his comment as set forth in LSA–R.S. 14:49.[7] Also, it is well established that proof of actual malice may destroy a qualified privilege.[8] Therefore,

7. "A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations: (1) Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same. (2) Where the publication or expression is a comment made in the reasonable belief of its truth, upon, (a) The conduct of a person in respect to public affairs; or (b) A thing which the proprietor thereof offers or explains to the public. (3) Where the publication or expression is made to a person interested in the communication, by one who is also interested or who stands in such a relation to the former as to afford a reasonable ground for supposing his motive innocent. (4) Where the pub-

lication or expression is made by an attorney or party in a judicial proceeding."
8. "Where a non-privileged defamatory publication or expression is false it is presumed to be malicious unless a justifiable motive for making it is shown.
"Where such a publication or expression is true, actual malice must be proved in order to convict the offender." LSA–R.S. 14:48.
"There shall be no prosecution for defamation in the following situations: (1) When a statement is made by a legislator or judge in the course of his official duties. (2) When a statement is made by a witness in a judicial proceeding, or in any other legal proceeding where testimony may be required by law, and such statement is reasonably believed by the witness to be relevant to the matter in controversy. (3)

this could only be determined after trial, and was not such as would authorize the sustaining of a motion to quash."

█ We find that the trial judge was correct in not passing on the second contention raised in defendant's Demurrer and Motion to Quash. Reviewed in association with LSA–R.S. 14:48–14:49, it shows that it presents matters on which evidence would have had to be heard during trial; it was therefore not subject to the pleadings advanced.

In our discussion of the third contention raised in the Demurrer and Motion to Quash, we initially observe that Article I, Section 3, of the Louisiana Constitution of 1921, provides that, "No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that liberty.*" (Emphasis ours.) The First Amendment to the United States Constitution recites that, "Congress shall make no law * * * abridging the freedom of speech * * *." The Fourteenth Amendment to the United States Constitution provides that, " * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the

United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."

█ These constitutional provisions will be considered hereinafter in connection with LSA–R.S. 14:47–14:50, quoted supra. They will be considered in the light that, "The freedom of speech and of the press secured by the First Amendment U.S.C.A. Const., against abridgment by the United States is similarly secured to all persons by the Fourteenth against abridgment by a state." Schneider v. State of N. J., Town of Irvington, 308 U.S. 147–165, 60 S.Ct. 146, 84 L.Ed. 155.

In Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, we find the following statement with respect to the guaranties of freedom of expression:

"The guaranties of freedom of expression in effect in 10 of the 14 States which by 1792 had ratified the Constitution, gave no absolute protection for every utterance. Thirteen of the 14 states provided for the prosecution of libel,[9] and all of those States made either blasphemy or profanity, or both, statutory crimes. As early as 1712, Massachusetts made it criminal to pub-

---

Against the owner, licensee or operator of a visual or sound broadcasting station or network of stations or the agents or employees thereof, when a statement is made or uttered over such station or network of stations by one other than such

owner, licensee, operator, agents or employees." LSA–R.S. 14:50.

9. "Libel, slander, and malicious prosecution are all methods of defamation." 53 C.J.S. Libel and Slander § 1, p. 31.

lish 'any filthy, obscene, or profane song, pamphlet, libel or mock sermon' in imitation or mimicking of religious services. * * * (Emphasis ours.)

"In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech. Beauharnais v. People of State of Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919. * * *

* * * * * *

"All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. * * *"

In Beauharnais v. People of the State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919, the defendant was charged by information in that he "did unlawfully * * * exhibit in public places lithographs, which publications portray depravity, criminality, unchastity or lack of virtue of citizens of Negro race and color and which exposes [sic] citizens of Illinois of the Negro race and color to contempt, derision, or obloquy * * *." Beauharnais challanged the statute under which he was of speech and of the press guaranteed as charged as being violative of the liberty against the States by the Due Process Clause of the Fourteenth Amendment. The United States Supreme Court affirmed the conviction, making the following pertinent statements in its decision:

"The statute before us is not a catch-all enactment left at large by the State court which applied it. * * * It is a law specifically directed at a defined evil, * * *

"Libel of an individual was a common-law crime, and thus criminal in the colonies. Indeed, at common law, truth or good motives was no defense. In the first decades after the adoption of the Constitution, this was changed by judicial decision, statute or constitution in most States, but nowhere was there any suggestion that the crime of libel be abolished. Today, every American jurisdiction—the forty eight States, the District of Columbia, Alaska, Hawaii and Puerto Rico—punish libels directed at individuals. * * *

"Every power may be abused, but the possibility of abuse is a poor reason for denying Illinois the power to adopt measures against criminal libels sanc-

tioned by centuries of Anglo-American law. * * *

"Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase 'clear and present danger.' Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class."

■ The United States Supreme Court has considered a number of cases cited by defendant, in which the defendants who were charged with contempt pleaded the protection of "Freedom of Speech." Before discussing these cases, we feel it pertinent to remark that under our Louisiana law the offense of defamation and the offenses of contempt and constructive contempt are not the same.

Constructive contempt, West's LSA–C.C. P., Art. 224(8), is defined in part as, "Comment by a newspaper or other medium for the dissemination of news upon a case or proceeding, then pending and undecided, which constitutes a clear, present, and imminent danger of obstructing or interfering with the orderly administration of justice by either influencing the court to reach a particular decision, or embarrassing it in the discharge of its judicial duties."

In Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470, the United States Supreme Court spoke of "Clear and Present Danger" as follows:

" * * * The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. * * *"

In Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, the defendants were adjudged guilty and fined for contempt of court; their convictions rested upon comments published in newspapers pertaining to pending litigation. Defendants challenged the State's action as an abridgment, prohibited by the Federal Constitution, of freedom of speech and of the press. In reversing the conviction, the United States Supreme Court stated in the beginning of its opinion that, "It is to be noted at once that we have no direction by the legislature of California that publications outside the court room which comment upon a pending case in a specified manner should be punishable." The Court went on to discuss the theory of evil, stating, "Moreover, the likelihood, however great that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself

must be 'substantial,' * * *" It found that the evil sought to be avoided was not substantial; it said, "* * * we are convinced that the judgments below result in a curtailment of expressions that cannot be dismissed as insignificant. If they can be justified at all, it must be in terms of some serious substantive evil which they are designed to avert. The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice." [10]

Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295, concerned contempt proceedings in which the defendant, Associate Editor of the Miami Herald, was charged with being contemptuous of the circuit court and its judges, in that he had published two editorials alleged to be unlawfully critical of the administration of criminal justice in certain cases then pending before the court. The United States Supreme Court reversed the conviction of the State Court on the theory of "Clear and Present Danger," stating, "The comments were made about judges of courts of general jurisdiction—judges selected by the people of a populous and educated community. They concerned the attitude of the judges toward those who were charged with crime, not comments on evidence or rulings during a jury trial. Their effect on juries that might eventually try the alleged offenders against the criminal laws of Florida is too remote for discussion. Comment on pending cases may affect judges differently. It may influence some judges more than others. Some are of a more sensitive fiber than their colleagues. The law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess any more than it generally can depend on the personal equations or individual idiosyncrasies of the tortfeasor. * * * We are not willing to say under the circumstances of this case that these editorials are a clear

10. It is interesting to note that the Louisiana State Supreme Court followed the Bridges rule in a contempt proceeding, Graham v. Jones, 200 La. 179, 7 So.2d 702, stating: "However, under the decision of the Supreme Court of the United States in the Bridges v. California and Times-Mirror Company v. Superior Court case, this proceeding for contempt against respondent must be discharged. * * * As we have pointed out in our opinion handed down today on the rules for contempt against the three New Orleans newspapers, [200 La. 137,] 7 So.2d 688, the decision of the Supreme Court of the United States in matters of contempt has repudiated the test of reasonable tendency heretofore prevailing and has substituted therefor the test of clear and present danger. Applying that test to the publication under review, we are bound to hold that there was no clear and present danger that the editorial would or could sway the five members of this Court from acting according to their convictions in declaring that the Reorganization Amendment was unconstitutional."

and present danger to the fair administration of justice in Florida. Cf. Near v. Minnesota, 283 U.S. 697, 714, 715, 51 S.Ct. 625, 630, 631, 75 L.Ed. 1357 [1366, 1367.]"

Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546, involved contempt proceedings for an editorial challenging a Texas court's procedure. In reversing the conviction, the United States Supreme Court stated:

" * * * But there was here no threat or menace to the integrity of the trial. The editorial challenged the propriety of the court's procedure, not the merits of its ruling. Any such challenge, whether made prior or subsequent to the final disposition of a case, would likely reflect on the competence of the judge in handling cases. But as we have said, the power to punish for contempt depends on a more substantial showing. Giving the editorial all of the vehemence which the court below found in it we fail to see how it could in any realistic sense create an imminent and serious threat to the ability of the court to give fair consideration to the motion for rehearing.

"There is a suggestion that the case is different from Bridges v. State of California * * * in that we have here only private litigation, while in the Bridges case labor controversies were involved, some of them being criminal cases. The thought apparently is that the range of permissible comment is greater where the pending case generates a public concern. The nature of the case may, of course, be relevant in determining whether the clear and present danger test is satisfied. But, the rule of the Bridges and Pennekamp cases is fashioned to serve the needs of all litigation, not merely select types of pending cases."

In Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569, defendant, an elected sheriff of Bibb County, Georgia, was held in contempt of court for expressing his personal ideas on a matter that was presently before the grand jury for its consideration; his ideas were conveyed to and published by the local press. In reversing the conviction and holding that defendant's right of freedom of speech had been abridged, the United States Supreme Court stated, "Our examination of the content of petitioner's statements and the circumstances under which they were published leads us to conclude that they did not present a danger to the administration of justice that should vitiate his freedom to express his opinions in the manner chosen."

As stated supra, Article I, Section 3, of the Louisiana Constitution of 1921, provides that a person speaking or publishing his sentiments is responsible for an abuse of that liberty. LSA–R.S. 14:47–14:50

were enacted pursuant to this provision, and they are specifically directed at a defined evil. It is unnecessary for us to consider the issues behind the phrase "Clear and Present Danger." See, Beauharnais v. People of the State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919, supra. LSA–R.S. 14:47–14:50 are an expression of Louisiana legislative will and have to do with the exposing of a person to hatred, contempt, or ridicule so as to deprive him of public confidence or social intercourse. We find nothing in the jurisprudence reviewed supra which prohibits such enactments as are herein under consideration. Also, as stated supra, Louisiana treats defamation and contempt as separate offenses; the jurisprudence we have heretofore reviewed dealt with the offense of contempt. As stated in the Roth and Beauharnais Cases, supra, libel has always been an offense under both common and statutory law. There have been many prosecutions under the libel laws; when the law and the evidence justi-

fied it, the person found guilty had a fine or prison sentence imposed on him. Freedom of Speech guaranteed under the Due Process clause of the Fourteenth Amendment has not been extended to those found guilty. See, Roth and Beauharnais Cases, supra; State v. Lambert, 188 La. 968, 178 So. 508, supra.

We conclude that LSA–R.S. 14:-47–14:50 are not null and void and are not prohibited by the First Amendment to the United States Constitution, guaranteed to citizens of the States by the Due Process Clause of the Fourteenth Amendment to that Constitution.

Defendant's contention that LSA–R.S. 14:47–14:50 fail to provide the procedural safeguard of a trial by jury is without merit and will be discussed hereinafter.

In the instant matter, it cannot be gainsaid that the use of the words "racketeer influences" when applied to anyone suggests and imputes that he has been influenced to practice fraud, deceit, trickery, cheating, and dishonesty.[11]

11. racketeer—" * * * a person who obtains money illegally, as by bootlegging, *fraud*, or especially, threats of violence. v. i. to obtain money in any of these ways." (Emphasis ours.)

fraud—" * * * a) deceit; trickery; *cheating*. b) in law, intentional deception to cause a person to give up property or some lawful right. 2. something said or done to deceive; trick; artifice. 3. [Colloq.] a person who deceives or is not what he pretends to be; impostor; *cheat*." (Emphasis ours.)

cheat—" * * * behave *dishonestly* or unfaithfully." (Emphasis ours.)

influence—" * * * 2.a) the power of persons or things to affect others, seen only in its effects. b) the action or effect of such power. 3. the power of a person or group to produce effects without the exertion of physical force or authority, based on wealth, social position, ability, etc. 4. a person or thing that has influence."

Webster's New World Dictionary, World Publishing Co., 1957.

The expression that the judges have enjoyed 300 days vacation out of 19 months suggests and connotes a violation of the "Deadhead" statute, LSA–R.S. 14:138, Public Payroll Fraud.

Other expressions set out in the Bill of Information connote malfeasance in office. LSA–R.S. 14:134; Art. IX, Sec. 1, La. Const. of 1921.

■ We conclude that the expressions of the defendant, as set out and charged in the Bill of Information were of a defamatory nature; they are alleged to be defamatory and to have been made maliciously; they were not subject to the protection of the First Amendment to the United States Constitution. All that we are considering in this Bill of Exceptions is the legal sufficiency of the Bill of Information and defendant's Demurrer and Motion to Quash filed to the Information. The questions of malice and proof of defamation will be discussed hereinafter.

Defendant's expressions set out in the Bill of Information are not criticisms of a court trial or of the manner in which any one of the eight judges conducted his court when in session. The expressions charged contain personal attacks upon the integrity and honesty of the eight judges which warranted trial on the merits.

Bill of Exceptions No. 3 is without merit.

Bill of Exceptions No. 4 was reserved to the denial by the trial judge of defendant's

motion for trial by jury, which motion recites in part:

"That the provisions of Article 7, Section 41 of the Louisiana State Constitution authorizing trial by the judge alone in cases of misdemeanor is unconstitutional, null and void in that the said State Constitutional provision is in violation of the Sixth and Fourteenth Amendments of the United States Constitution, depriving petitioner of his right to trial by jury and depriving him of due process of law.

"That in the alternative defendant alleges that any issue involving the determination of Constitutional rights in general and the right of freedom of speech in particular must be tried by jury under the requirements of the above mentioned United States Constitutional provisions; that the trial of this case will necessarily involve a determination as to certain fundamental Constitutional rights of the defendant and that the trial of this case without jury would serve to deny to defendant due process of law under the Sixth and Fourteenth Amendments of the United States Constitution."

In this Court defendant advances the same contentions as set forth in his motion for trial by jury; he raises the additional argument that the reasoning and holding of the United States Supreme Court in the

case of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, decided March 18, 1963, should be applied to the instant bill.

Article VII, Section 41, of the Louisiana Constitution of 1921, provides:

" * * * *All cases in which the punishment may not be at hard labor shall, until otherwise provided by law, be tried by the judge without a jury.* Cases, in which the punishment may be at hard labor, shall be tried by a jury of five, all of whom must concur to render a verdict; cases, in which the punishment is necessarily at hard labor, by a jury of twelve, nine of whom must concur to render a verdict; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to render a verdict." (Emphasis ours.)

LSA–R.S. 15:340 recites:

"Every misdemeanor shall be triable by the judge without the intervention of a jury."

LSA–R.S. 15:341 states:

"A misdemeanor is defined to be an offense, the punishment of which is necessarily a fine or imprisonment in the parish jail or both." [12]

12. In Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672, the United States Supreme Court held that Criminal Contempt cases are not subject to

LSA–R.S. 14:47, under which the defendant was charged, provides that, "Whoever commits the crime of defamation shall be fined not more than three thousand dollars, or imprisoned for not more than one year."

Amendment VI to the United States Constitution recites:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence."

In State v. Hadad, 142 La. 69, 76 So. 243, this Court has held that the provisions of the Sixth Amendment to the United States Constitution relating to jury trials refer to prosecutions for the violation of federal statutes and not to prosecutions in state courts for violations of state statutes. See, 20 La.L.Rev. 680; Cf. State v. Pailet, 139 La. 697, 71 So. 951. See, also, State v. Harvey, 159 La. 674, 106 So. 28, Cert. denied, 273 U.S. 635, 47 S.Ct. 20, 71 L.Ed. 815.

jury trial as a matter of constitutional right. Cf. Loyola Law Review, 1961–62, p. 49.

In State v. Porter, 176 La. 673, 146 So. 465, we have held that parties may waive or renounce what law establishes in their favor, unless expressly or impliedly prohibited by law or public policy. We stated emphatically, however, that, "The law which provides that persons charged with capital offenses or those necessarily punishable by imprisonment at hard labor shall be tried by juries was made in the interest of both the accused parties and the state and neither is permitted to derogate from it. State v. Thompson, 104 La. 167, 28 So. 882; State v. Jackson, 106 La. 189, 30 So. 309." Cf. Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854.

In State v. Livaudais, 161 La. 882, 109 So. 536, we stated:

"The responsibility resting upon the trial judge, and the latitude of discretion invested in him, in a prosecution for libel is exceptionally great. The penalty is either fine or imprisonment, or both, at the discretion of the judge. Rev.Stat., § 804. In such case, the fine may be as great as $1,000, or as small as the judge deems fit; and the term of imprisonment may be as long as two years, or as short as the judge deems fit. Rev.Stat. § 982. The imprisonment being without hard labor, the case must be tried by the judge, without a jury. Const. art. 7, § 41, p. 50. The defendants in such case have no right of appeal, unless the judge sees fit to impose a fine exceeding $300, or imprisonment for a term exceeding six months, and even then, there is no appeal from the judge's findings of fact on the question of guilt or innocence. Const. art. 7, § 10, par. 7."

In Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, Betts was indicted for *robbery*. He was unable to employ counsel, and he was refused his request for such after informing the trial judge of his indigent position. Without waiving his asserted right to counsel, he pleaded not guilty and elected to be tried without a jury. The judge found him guilty and imposed a sentence of eight years. Betts applied for Habeas Corpus while serving his penitentiary term; the writ was granted, but relief was denied by the State court. The United States Supreme Court granted Certiorari and affirmed the lower court, stating:

"The Sixth Amendment of the national Constitution applies only to trials in federal courts. The due process clause of the Fourteenth Amendment does not incorporate, as such, the specific guarantees found in the Sixth Amendment although a denial by a state of rights or privileges specifically embodied in that and others of the first eight amendments may, in certain circumstances, or in connection with other elements, operate, in a given case, to

deprive a litigant of due process of law in violation of the Fourteenth. * * * "

In Gideon v. Wainwright, supra, Gideon was charged in a Florida State court with having broken and entered a poolroom with intent to commit a misdemeanor. *This offense is a felony under Florida law.* Gideon was unable to employ counsel, and his request for such was denied by the court. He conducted his own defense and was found guilty by a jury; he was thereafter sentenced to serve five years in the penitentiary. The United States Supreme Court granted Certiorari to review a decision of the Florida Supreme Court on hearing of a Writ of Habeas Corpus to the effect that refusal to appoint counsel for Gideon did not deprive him of his constitutional rights. Betts v. Brady, supra, was reviewed; with respect to its holding in that case, the United States Supreme Court stated:

"We accept Betts v. Brady's assumption, based as it was on our prior cases, that a provision of the Bill of Rights which is 'fundamental and essential to a fair trial' is made obligatory upon the States by the Fourteenth Amendment. We think the Court in Betts was wrong, however, in concluding that the Sixth Amendment's guarantee of counsel is not one of these fundamental rights. Ten years before Betts v. Brady, this Court, after full consideration of all the historical data examined

in Betts, had unequivocally declared that 'the right to the aid of counsel is of this fundamental character.' Powell v. Alabama, 287 U.S. 45, 68, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932). * * *

* * * * * *

"The Court in Betts v. Brady departed from the sound wisdom upon which the Court's holding in Powell v. Alabama rested. Florida, supported by two other States, has asked that Betts v. Brady be left intact. Twenty-two States, as friends of the Court, argue that Betts was 'an anachronism when handed down' and that it should now be overruled. We agree."

Since the present defendant was only charged with a *misdemeanor,* and the defendants in the Betts and Gideon Cases were charged with a *felony,* we do not think that the cases are apposite. As stated supra, Article VII, Section 41, of the Louisiana Constitution of 1921, provides that a defendant in a *felony case shall be tried by a jury.* In State v. Porter, supra, we held that trial by jury cannot be waived in certain instances.

We do not think that a comparison can be made between a request for counsel in a felony case and a request for trial by jury in a misdemeanor case. In one instance, there is an indigent defendant who cannot afford to have his defense properly presented asking for counsel to be appointed

by the court to represent him; in the other, the defendant objects to trial of a misdemeanor by a skilled trier of facts and law (his responsibility is set out in State v. Livaudais, supra) and asks for trial by jury. We conclude that Gideon v. Wainwright, supra, is not controlling of the instant prosecution; here the defendant neither suffered prejudice nor deprivation of due process of law under the Fourteenth Amendment.

 We conclude that the provisions of Article VII, Section 41, of the Louisiana Constitution of 1921, authorizing trial by the judge alone in misdemeanor cases, are constitutional. We find no prohibition against such provisions in the Constitution of the United States or in the decisions of the United States Supreme Court.

Bill of Exceptions No. 4 is without merit.

Bill of Exceptions No. 5 is neither a part of the record nor argued in the State's or defendant's brief. We conclude that it has been abandoned.

 Bill of Exceptions No. 7 is not a part of the record; it is not included in the State's brief, and it is only mentioned by number in the defendant's brief. We conclude that it has been abandoned.

Bills of Exceptions Nos. 6, 8, 9, and 11 will be included under one heading because of their similarity of content.

Bill of Exceptions No. 6 was reserved when the trial court permitted the State to ask Arthur Roane (a newspaper reporter for the Times-Picayune, a New Orleans paper, who had previously testified that he was present in the District Attorney's office on the morning of November 2, 1962, and that the defendant had made a statement to him), "Did you make a report of this statement to your paper?" The objection of counsel for the defendant was to the effect that the Bill of Information charges defamation resulting from the publication in the New Orleans States-Item, and that the defendant was not charged with defamation as a result of publication in the Times-Picayune. He contended, "That statement is irrelevant and immaterial that he reported to the Times-Picayune."

The ruling of the trial court with respect to Bill of Exceptions No. 6 recites:

"* * * The Court rules that solely for the purpose of showing *malice*, this evidence will be admissible and is restricted to the question of showing *malice*. There has been raised in the preliminary motion filed herein the question of a qualified privilege by the Defendant and if the Court finds that it was in fact a question of law, that there is a qualified privilege, then the burden of proof would shift to the Plaintiff—to the State—to show malice —actual malice, regardless of the truth

or falsity of the statement. So for that reason, the evidence is admitted solely for the purpose of showing *malice*. Now, you may answer the question and you may reserve your bill." (Emphasis ours.)

Bill of Exceptions No. 8 was reserved when the trial judge permitted the following testimony of Arthur Roane:

"Q. Did he make a statement to you on November 9?

"A. I suppose he did. He makes statements to me very often.

"Q. Did he make a statement to you that he threatened to take racketeering influences of the Judges to the Grand Jury?

\* \* \* \* \* \*

"Q. What was Mr. Garrison's statement to you?

"A. You are referring to this particular question there?

"Q. The article that you just refreshed your memory on.

[Discussion]

"Q. Did Mr. Garrison make that statement to you?

"A. Yes. I don't know if it was on the particular date preceding this paper but he has said that to me."

In overruling the objection of counsel for the defendant to the above testimony, the

trial judge stated, "The statement is admitted for the purpose of showing malice and Courts have held that statements made even after the time are admissible if they are connected with it."

Bill of Exceptions No. 9 was reserved when the trial judge permitted Jack Kneece, a General Assignment Reporter for the Times-Picayune, to testify with respect to his coverage of a meeting of the Press Association in the International Trade Mart Building on Saturday night, January 12, 1963. His testimony is to the effect that the defendant spoke for fifteen to twenty minutes at the meeting, and that part of the speech was directed to the question of racketeering influences on the judges involved.

In admitting the testimony of Kneece, the trial judge stated that he refused to strike the evidence from the record for the reason that "it was found to be introduced under the general ruling that the statement he made with reference to this case was admissible only for the purpose of showing malice, and the evidence is restricted to that and to that alone."

Bill of Exceptions No. 11 was reserved when Robert Kelso, a newspaper reporter for the States-Item, was permitted to testify according to his recollection with respect to parts of a talk given by the defendant on January 11, 1963, at the Monteleone Hotel. Kelso's testimony was with respect to statements made by the defendant with regard

to the eight judges herein involved and was admitted for the purpose of showing malice.

In this Court defendant argues that:

"The trial judge erred in admitting these other statements of the accused in evidence at this trial on the theory that they were admissible under Article 445–446 of the Code of Criminal Procedure, [LSA–] R.S. [15:] 445–446 to show malice on the part of the accused, which the State would have to prove should the court hold that the November 2 statement was privileged. * * * These other statements of the accused involved in these bills were also comments upon the conduct of the Judges in respect to public affairs, made by the accused in the reasonable belief of their truth, and hence they also were privileged, and malice could not be inferred from these privileged statements any more than it could be inferred from the November 2 statement. The State had the burden in this proceeding of establishing malice on the part of the accused toward the Judges by positive evidence tending to show that the accused felt hatred and ill will toward the Judges and wanted to hurt them, and that this hatred, ill will and desire to injure on his part was the motivating cause of this November 2 statement. See Clark and Marshall, Crimes, p. 76, Sec. 48 (1952); State v. Lambert, 188

La. 968, 178 So. 508. The State completely failed to offer any evidence of this type; instead, the State's witnesses testified that the accused showed and expressed no hostility toward the Judges, but was actuated by the belief that a public wrong had been committed and that it was his duty to inform the public of this fact. * * * The basis of the trial judge's holding that Garrison acted from malice in this matter is that these other statements of the accused reveal malice on his part. * * * Thus, prevented by the statutes and jurisprudence of this state from inferring malice from the November 2 statement, he inferred it from the other privileged statements!

"The trial judge erred in admitting these other statements in evidence, and he doubly erred in using them to impute malice to Garrison. If malice cannot be inferred from one privileged publication, how can it be inferred from three other equally privileged publications?"

In answer to the Application for a Bill of Particulars the State said that it would contend that the statement of the defendant set forth in the Bill of Information constitutes malice in law and also malice in fact.

"Under the express terms of the statute, malice is an ingredient of the

crime of libel. Without malice there can be no criminal responsibility. The general rule is, that legal malice, which in law means a wrongful act done intentionally, without just or lawful excuse, is sufficient to support a charge that the publication is libelous. And malice is presumed by the publication. But the rule has its limitations in cases of privileged communications. State v. Bienvenu, 36 La.Ann. 378. Where the communication is privileged, malice is not presumed by law. Berot v. Porte, 144 La. 805, 81 So. 323, 3 A.L.R. 1651. In such communications the privilege can only be destroyed by actual malice, legal malice is not sufficient for the purpose.

\* \* \* \* \* \*

"If the privilege is only qualified the onus lies on the plaintiff in a civil suit or on the State in a criminal prosecution of proving actual malice. This may be done either by extrinsic evidence of personal ill feeling or by intrinsic evidence, such as the exaggerated language, the mode and extent of the publication, and other matters in excess of the privilege. Odgers on Libel and Slander, 2d Ed., p. 438." State v. Lambert, 188 La. 968, 178 So. 508.

"There is much confusion with respect to the use and meaning of the term 'malice' in the law of defamation.

In one sense it denotes merely the absence of lawful excuse or privileged occasion; in another it denotes ill will, evil motive, intention to injure, or wanton disregard of the rights of others." 53 C.J.S. Libel and Slander § 2, p. 35.

"In its popular sense, the term 'malice' means hatred, ill will or hostility to another, but this is not necessarily its meaning in law. In its broadest legal sense, it means the state of mind of a person, irrespective of his motive, whenever he consciously violates the law. Under this concept every person who is sui juris, and who, without justification or excuse, wilfully does an act which is prohibited and made punishable by law as a crime, acts maliciously. \* \* \*

\* \* \* \* \* \*

"*Express and Implied Malice.*—Malice is divided into express and implied malice. Express malice \* \* \* is actual malice, or malice in fact, and exists when a person actually contemplates the injury or wrong which he inflicts,—as when a man shoots at another with the intent to kill him.

"Implied malice \* \* \* otherwise called constructive malice, or malice in law, is where the law implies or imputes malice because of the nature of the act done, and irrespective of the actual intent of the party. \* \* \*".

Clark and Marshall, Crimes, Sec. 5.05, p. 248.

"Various facts may be considered in determining the existence of malice. Evidence of ill feeling, unfriendly relations, and trouble between accused and the victim of an offense, and evidence concerning the conduct and sayings of the accused shortly before and after the offense was committed, are admissible for such purpose.

" * * * " Wharton's Criminal Evidence, Sec. 165, p. 320.

As stated in the above quotations, "malice" is many things. Herein, the defendant pleaded a qualified privilege, and the State, as plaintiff, assumed the burden of proving malice. In offering the present testimony to which objection was raised, the State was not concerned with prior or subsequent defamations; it was merely trying to show by similar statements the malice it had previously alleged with respect to the Bill of Information. In his Per Curiam Bill of Exceptions No. 8, the trial judge pertinently stated:

"In an attempt to prove malice it is impossible to probe the heart or mind of the defendant to ascertain whether or not there was malice, hatred, ill will or enmity or a wanton desire to injure, but the best proof of that state of mind is what he says and does with reference thereto, both before and after the defamatory statement is published if it be in connection with the defamation charged."

■■■ We agree with the trial judge that intent is involved in malice. In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the Information, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction. LSA–R.S. 15:445.

" * * * 'Other words than those laid in the petition, and spoken at other times, but within one year before the inception of the suit, may be given in evidence, for the purpose of showing malice in the defendant.' " Kendrick v. Kemp, 6 Mart., N.S., 500.

Under Relevancy, in Jones on Evidence, Civil and Criminal, Fifth Edition, Vol. 1, Sec. 159, p. 285, it is well stated:

"The generally recognized rule is that 'When there is a question whether a person said or did something, the fact that he said or did something of the same sort on a different occasion may be proved, if it shows the existence on the occasion in question of any intention, knowledge, good or bad faith, malice or other state of mind, or of any state of body or bodily feeling, the existence of which is in issue or is deemed to be relevant to the issue;

but such acts or words may not be proved merely in order to show that the person so acting or speaking was likely on the occasion in question to act in a similar manner.'" See, 53 C.J.S. Libel and Slander § 214(b), p. 323.

Because the trial judge, the State, and the defense were concerned with malice in the instant prosecution, we find that the trial judge properly admitted the testimony, supra, to which counsel for the defendant objected and made the basis of these bills.

Bills of Exceptions Nos. 6, 8, 9, and 11, are without merit.

Bills of Exceptions Nos. 12, 13, and 14 · are not a part of the record, and they are not argued in the State's brief nor in the defendant's brief. We conclude that they have been abandoned.

Bills of Exceptions Nos. 10, 15, 16, and 17 will be discussed jointly; the matters therein involved are similar.

Bill of Exceptions No. 10 was reserved when Malcolm V. O'Hara, Judge, Section "A," Criminal District Court, was asked the following question, "As a result of the statement made by Mr. Garrison that I referred to, have you been affected in any way?" and he responded, "Well, I am going to have to answer that this way: Naturally, being in public office and having held public office for a number of years, I know a number of people, and the impression that I get from the people who discuss this matter with me—it is done in the following ways: People jokingly ask me if it is true that we get all these vacations, whether or not I am a sacred cow, or whether I am influenced by racketeers. It is no one person or nothing specific; it is a cumulative sort of a thing done in a joking sort of manner, but the one thing—my one impression out of the thing, if this is admissible—is that the bench, the criminal bench, seems to be getting the worst of public opinion, that the bench has suffered to some extent as a result of it, but nobody has hit me or threatened me or anything like that."

Objection to the above testimony was predicated on the grounds that it was based on impression and on hearsay. In admitting this testimony the trial court stated that it was "allowing the evidence to stand solely for the purpose of showing whether there was any reaction of the public, without the details of the reaction, if there was any reaction of the public to the public article such as it would bring it within the intendment and the definition of *defamation* as set forth in the [LSA–] Revised Statutes, Title 14, Section 47, and restricting it to that. * * *"

Bill of Exceptions No. 15 was reserved when Shirley G. Wimberly, Judge, Section "G," Criminal District Court, was permitted to give the following testimony:

"Q. Judge, · the statement that Mr. Garrison made, has it subjected you to ridicule?

"A. Yes, it has.

"Q. Would you tell the Court how?

"A. Well, I have received many telephone calls of derision."

The objection to the foregoing testimony was based on the ground that it was strictly hearsay. The ruling of the trial court was as follows:

"The Court rules that the testimony is admissible, that there has been a public reaction by reason of the alleged defamatory statement. There would be no other way of showing that the publication alleged to be defamatory and exposed the person claimed to be defamed to hatred, contempt or ridicule or to deprive him of the benefit of public confidence or social intercourse, as provided in the [LSA–] Revised Statutes, Title 14, Section 47, dealing with defamation and the subsequent articles on the same subject. The Court rules at this time that what was said to the witness would be hearsay evidence but the fact that a statement was made to him would not be hearsay evidence if the statement itself is not in evidence, but there is no way to show otherwise that he has been subjected to this injury or to defamation, other than the fact that there was a communication to him showing the public pulse or the public reaction to the statement that was made. * * "

Bill of Exceptions No. 16 was reserved when Oliver Paul Schulingkamp, Judge, Section "F", Criminal District Court, was permitted to answer the following question, which he answered affirmatively:

"Since the publication of this statement by Mr. Garrison about the Judges, have you been subjected to ridicule, embarrassment and so forth as the result of the publication of said article?"

The objection to this question was based on the grounds that it would be purely speculation for the witness to state facts in answer to the question, and that his response would be purely his impression and thus hearsay.

The trial judge's ruling with respect to Bill of Exceptions No. 16 was similar to that given to Bills of Exceptions Nos. 10 and 15.

Bill of Exceptions No. 17 was reserved when Thomas M. Brahney, Jr., Judge, Division "D", Criminal District Court, was permitted to testify as to whether he had been subjected to hatred, contempt, and ridicule as a result of the publication of November 2, 1962.

The objection to the question was based on the ground that the witness would not be

in a position to know, except in his own opinion, whether anything that occurred to him after the alleged statement of Mr. Garrison was actually due to the statement. It was contended that the testimony would be irrelevant, immaterial, and not pertinent to the case. The trial judge gave the following ruling with respect to the objection:

"The Court is of the opinion that the evidence is admissible because there is no other way to show that he has been subjected to any hatred, contempt and ridicule and deprived him of the confidence or social intercourse, as stated in the statutory language, as stated in [LSA–] Revised Statutes Title 14, Section 47, within the intentment of that statute. He would be the only one who might or might not know. If he said that he knows that he has been subjected, I think he has a right to testify to that fact as to whether or not he has."

In this Court defendant contends that the trial judge's rulings, supra, which he incorporated in his per curiams to the instant bills, were a violation of LSA–R.S. 15:434 which provides that hearsay evidence is inadmissible, except as otherwise provided in the Code of Criminal Procedure.

■ We agree with the reasoning of the trial judge to the effect that when a person has been defamed, he has been exposed to hatred, contempt or ridicule (LSA–R.S. 14:47), and that the person's testimony with respect to such exposure is proof of an essential ingredient of the crime charged —Defamation—and is not hearsay.

■ We conclude that the testimony of each of the four judges was not hearsay; it was given to prove an ingredient of the offense herein charged and alleged. The trial judge has correctly stated the law in his rulings, and we find no abuse of his discretion.

Bills of Exceptions Nos. 10, 15, 16, and 17, are without merit.

■ Bill of Exceptions No. 18 was reserved when Joseph I. Giarrusso, Superintendent of the New Orleans Police Department, a witness called on behalf of the State, was permitted to answer the following question:

"Q. Has the District Attorney called upon you for any more help with reference to the vice investigations?

"A. No, sir, he has not."

The ground of objection was that the question was misleading and involved matters not herein concerned.

We do not find that the question was misleading. The following statement of the trial judge reflects his reason for admitting the testimony and shows that he committed no abuse of discretion:

"At this time, the Court will state that it appears that one of the triggering causes of the giving of the statement on November 2, 1962 by Mr. Garrison to the press, on which this charge of defamation was made, was that this arose by reason of a dispute as to the investigations to be made and the right for the investigation to be paid for by the District Attorney. Throughout the record there have been, without objection, discussions of whether or not the last paragraph—I believe it is the last paragraph of [LSA–R.S.] Title 15, Section 571.11—as to the disposition of fines and forfeitures, concerning the disposition to be made and the right to the use thereof by the District Attorney of Orleans Parish. That has gone on throughout the trial of this case.

"There has been injected into this case, without objection, the question as to whether or not that paragraph of that particular act, which is an amendatory act, is unconstitutional, is violative of the constitutional provisions with reference to the Charter of the City of New Orleans, in which it was the contention of the Judges, and so testified to by them without objection, that they considered it unconstitutional for the reason that the police powers of the City of New Orleans were vested solely in the Police Department under the Home Rule Charter and under the constitutional provisions with reference to the Charter of the City of New Orleans. Therefore, the Court considers that it is very vital to a correct consideration of this as to whether or not this Defendant might or might not have called upon the City of New Orleans for additional help in addition to the police which were assigned to him, and I believe that there is no dispute that at least 12 policemen of his own choosing were assigned to his office at his request. That is not disputed. Therefore, the Court is of the opinion that it is perfectly permissible to show whether or not the District Attorney at any time called upon the Police Department of the City of New Orleans for additional help. * * *"

Bill of Exceptions No. 18 is without merit.

Bill of Exceptions No. 19 is neither made a part of the record nor argued in brief. We consider that it has been abandoned.

Bill of Exceptions No. 20 was reserved when the trial judge rejected Proposition of Law No. Eleven. Counsel for the defendant presented the charge to the court before argument in the same fashion as a charge would have been presented had the case been tried by a jury; it recited:

"Publications made in the discharge of a public duty under authority

of law are privileged. Burdick, Law of Crime, v. 3, p. 166, sec. 795; see Deshotel v. Thistlethwaite, 240 La. 12, 121 So.2d 222."

In this Court counsel for the defendant states:

"Defense counsel objected to the rejection of Proposition of Law No. 11 for the reason that the testimony of all of the complaining witnesses shows that Mr. Garrison's actions in this case arose directly out of his duties as District Attorney for the Parish of Orleans; that this is factually supported by all of the testimony in the entire record; that he was discharging a public duty when this controversy arose; and further that he has the duty, as a matter of law, to inform the public on the conduct of his office, and if he is thwarted in the operation and conduct of his office, then he has the duty to inform the public why he is being thwarted. * * *"

Section 795 of the Law of Crime, William L. Burdick, p. 165, recites:

"There are some exceptions to the general common law rule that written and published defamation is criminally libelous even if it is true, since certain occasions are privileged on the ground of public interest and policy. Privileged occasions are either absolute or qualified. They are absolute when the law protects them with absolute immunity from any prosecution, either civil or criminal, although the publication may be knowingly false and with express malice. Absolute privilege is limited, however, to proceedings in which the public service and the administration of justice require absolute freedom of expression, regardless of truth, such as legislative and judicial proceedings, matters involving military affairs, and publications made in the discharge of public duty under authority of law, or made to the heads of departments of the state. The law regards these occasions as absolutely privileged since they are of such public importance that the utmost freedom of expression, spoken or written, is deemed necessary for those whose duty it is to take part in them, regardless of the possible incidental defamation of any individual."

In Deshotel v. Thistlethwaite, supra, Deshotel, an attorney, brought suit against Thistlethwaite, Editor and Publisher of the Daily World Newspaper, for damages allegedly resulting from defamatory remarks made by Thistlethwaite in a television appearance. Thistlethwaite's defense of truth was found to have no merit. This Court then considered his alternative defense of fair comment and criticism alleged to be enjoyed as a qualified privilege; it held:

"The law relied on here by appellant is incorrectly stated, and the cases cited are for the most part inapposite, as statements made relative to the actions of a candidate for public office are not, under Louisiana law, qualifiedly privileged even though false. * * *

\* \* \* \* \* \*

"The cases relied on by counsel for Thistlethwaite in connection with his argument that even false statements about public officials are privileged * * * are easily distinguishable. They deal with the conditional privilege which shields the statements of one who has a special duty to speak. See Prosser, Law of Torts (2d ed. 1955) pp. 614–617. *To be actionable such statements must have been made maliciously,* with knowledge of their falsity. * * * And although it can be argued that appellant's position in the case at bar derives some support from language appearing in our decision in Flanagan v. Nicholson Publishing Company, 137 La. 588, 68 So. 964, L.R.A.1917E, 510, this court has pointed out in subsequent decisions that the Nicholson case is only authority for the proposition that Louisiana recognizes the doctrine of qualified privilege respecting fair comment and criticism of public officers and men in public life, but that 'the privilege does not extend to the publication of false statements of fact concerning public officers.' Martin v. Markley, 202 La. 291, 11 So.2d 593, 594; Kennedy v. Item Co., 213 La. 347, 34 So.2d 886." (Emphasis ours.)

In rejecting the Proposition of Law, supra, the trial court found that it had no application to the facts of this case and was not a full and correct statement of the law; in its per curiam it stated:

"* * * It was further rejected for the reason that it would require an extended qualification, explanation and limitation if it were applicable. Further, the statement was incomplete, and under these circumstances the court was not required to charge this. LSA-R.S. 15:390,[13] and cases thereunder.

"Further, it was rejected as not a complete and correct statement of the complete ruling in the case of Deshotel v. Thistlethwaite, cited."

---

13. "The prosecution and the defense have each the right to present to the court, before the argument has begun, any written charge or charges, and request that the same be given. Except as otherwise provided herein, the judge must give every such requested charge that is wholly correct and wholly pertinent, unless the matter contained in such charge have been already given, or unless such charge require qualification, limitation or explanation." LSA–R.S. 15:390.

After reading the Deshotel case, supra, · we agree with the finding of the trial judge herein that the Proposition of Law does not contain the complete and correct holding of the case.

 It is to be noted that the defendant relied on privilege, and the State contended that the expression of the defendant constituted malice in law and also malice in fact. Malice is presumed where a non-privileged publication or expression is false (LSA–R.S. 14:48); where a qualified privilege exists, malice must be proved (LSA–R.S. 14:49). With respect to the statement from Burdick, supra, the trial judge correctly found ·

"This was a Proposition of law taken out of context of the author and was subject to qualification, explanation and limitation in a consideration of the whole of the article. In the discharge of a public duty under authority of law, or a public officer in informing the public of the conduct of his office, it should be that the publication would be true in the discharge of a public duty, asserting legitimate reasons, rather than a false defamatory statement imputing wrongdoing to another public officer without any facts to justify it. * * *" See, State v. Turner, 228 La. 202, 81 So.2d 861.

The trial judge made the following factual finding:

"I did not find that the statement made by the defendant was a publication made in the discharge of a public duty altogether, but was a defamatory statement of fact maliciously made, and not a comment alone upon admitted facts; but he went beyond that and made statements of fact which were false.

"Further, I did not find that this charge was *wholly correct* and *wholly pertinent* to the facts in this case. Also, I found that it would require an even more extended qualification, explanation and limitation if it were applicable."

 Under his factual finding, the trial judge was correct in rejecting Proposition of Law No. Eleven.

Bill of Exceptions No. 20 is without merit.

 Bills of Exceptions Nos. 21, 22, and 23 will be jointly discussed.

Bill of Exceptions No. 21 was reserved when the trial court qualified Proposition of Law No. Thirteen, which had been submitted to it prior to argument; it recites:

"Article 1, Section 3, of the Louisiana Constitution and the First Amendment to the United States Constitution require that persons be given the opportunity to inform the community

of both sides of an issue of public interest. The purpose of these constitutional guarantees is to protect parties in the free publication of matters of public concern, to secure their right to a free discussion of public events and public measures, and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them. Cooley's 2 Constitutional Limitations (8th ed. 1927) 885; Wood v. Georgia, 370 U.S. 375 [82 S.Ct. 1364, 8 L.Ed.2d 569]."

The trial court qualified Proposition of Law No. Thirteen by pointing out that Article I, Section 3, of the Louisiana Constitution of 1921, was not a part of the holding in the case of Wood v. Georgia, supra. This section provides that a person is responsible for the abuse of liberty of speech or of the press.

In this Court defendant avers in brief:

"The accused, through his counsel, excepted on the ground that Wood v. Georgia dealt with freedom of speech, and it is immaterial whether freedom of speech is challenged through the medium of contempt proceedings or criminal defamation proceedings—if freedom of speech protects an individual,

it protects him against all challenges. * * *"

Bill of Exceptions No. 22 was reserved when the trial court rejected Proposition of Law No. Fourteen, which recites:

"The role that elected officials play in our society makes it imperative that they be allowed freely to express themselves on matters of current public importance. The First Amendment to the United States Constitution affords an absolute privilege to an elected official who expresses himself on such matters. Wood v. Georgia, 370 U.S. 375 [82 S. Ct. 1364, 8 L.Ed.2d 569]."

The trial judge rejected the Proposition, because he "did not find that the Constitution of the United States or the Constitution of the State of Louisiana grants an *absolute* privilege to make *any* statement, particularly a false defamatory or derogatory statement, simply because a person is an elected official, in commenting on matters of public importance, and in so doing, make unsubstantiated and false statements of fact regarding other persons, rather than commenting upon admitted facts, and the party defamed would have no legal remedy."

In this Court defendant avers:

"Defense counsel excepted to this rejection, pointing out that Article 1,

Section 3, of the Louisiana Constitution cannot bar the accused's rights under the First Amendment to the United States Constitution, and further that the record in this case disclosed that Mr. Garrison was an elected official with a duty to the people of the Parish of Orleans, and that thus Proposition of Law No. 14 is pertinent in this case. * * *"

Bill of Exceptions No. 23 was reserved when the trial court rejected Proposition of Law No. Sixteen, which recites:

"Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, but not through punishment for the expression. Under our system of government, counter-argument and education are the weapons available to expose these matters, not abridgment of the right of free speech. Wood v. Georgia, 370 U.S. 375 [82 S.Ct. 1364, 8 L.Ed.2d 569]."

After differentiating the instant prosecution from Wood v. Georgia, supra, the trial court found:

"It goes without saying that principles of law are applied to the facts in the case, and I did not find this *wholly correct* or wholly pertinent to the facts in this case; particularly that it was a partial statement taken out of context on an entirely different factual situation."

Defendant avers in this Court:

"Through counsel, the accused objected, stating that if the cloak of freedom of speech is present, it protects the accused in this case from all challenges to that freedom, including charges of criminal defamation, and that the rights guaranteed to the accused by the United States Constitution cannot be abridged by the law, jurisprudence, or Constitution of the State of Louisiana. * * *"

We find no merit in Bills of Exceptions Nos. 21, 22, and 23. Our reasons for such finding are set forth in our lengthly discussion of Bill of Exceptions No. 3, which in part pertained to similar matters. The trial judge was correct in his rulings; his reasoning in distinguishing Wood v. Georgia, supra, from the instant prosecution in his per curiams to the instant bills is very similar to that of this Court in Bill of Exceptions No. 3. He did not abuse his discretion nor commit error with respect to the provisions of LSA–R.S. 15:390, supra.

Bills of Exceptions Nos. 21, 22, and 23, are without merit.

Bill of Exceptions No. 24 was reserved when the trial court qualified Proposition of Law No. Seventeen, which recited:

"Actual malice cannot be inferred from any qualifiedly privileged statement. It must be proven by extrinsic evidence of hatred, ill will or the wanton desire to injure on the part of the accused."

The trial judge qualified the Proposition by the following statement from State v. Lambert, 188 La. 968, 178 So. 508:

"If the privilege is only qualified the onus lies on the plaintiff in a civil suit or on the State in a criminal prosecution of proving actual malice. This may be done either by extrinsic evidence of personal ill feeling or by intrinsic evidence, such as the exaggerated language, the mode and extent of the publication, and other matters in excess of the privilege. Odgers on Libel and Slander, 2d Ed., p. 438."

In his per curiam to the instant bill, the trial judge sets forth, as follows, his further reasons for qualifying the Proposition:

"My reason for qualifying it was that my impression was that it sought *to restrict the proof of actual malice to extrinsic evidence only, of hatred, ill will or wanton desire to injure on the part of the accused.*

"Actual malice is susceptible to other definitions also and could be proven by extrinsic evidence under those defini-

tions, and the State is not restricted in proving actual malice by any other legal means.

"It was also qualified by the provisions of LSA–R.S. 14:49, which provides that the State must prove actual malice, whether the statement is true or false, under the provisions of said article.

"Counsel for defendant * * * made the statement as to how he appreciated the ruling in that the effect was that the State must prove malice in cases only involving qualified privilege. I do not see how this appreciation was arrived at as I was discussing nothing more than the law of actual malice and a qualifiedly privileged statement as requested by counsel.

"Counsel has in this bill of exception set up an additional explanation after ruling, stating his reasons therefor the proof of malice in all cases. This question could not be raised after the requested charge was given because there was no request made of the court for a charge as to the law on a non-qualifiedly privileged statement or legal malice. Therefore, counsel has set up in this bill of exception the question of legal malice where there is no qualified privileged statement, which was not requested of the court in the charge; and,

of course, this additional reason asserted after the court has ruled on the proposition of law submitted does not make it a proposition of law or a charge that should have been passed upon and should form no part of the bill of exception. It is a recognized principle of law that a judge is presumed to know the law and does not have to charge himself on any question of law not requested in a misdemeanor case tried by the judge alone.

"The requested charge was *granted* but was qualified for the reason that it was not a complete statement of the law of proof of actual malice and was not a *wholly* correct statement of the law as applied to the facts in this case."

In the present bill of exceptions, counsel for the defendant avers that he objected to the ruling of the trial judge for the reason "that the State must prove malice in all cases of criminal defamation, whether a qualified privilege exists or not; that in cases of qualified privilege the State must prove actual malice; in cases where the qualified privilege does not exist, the State must prove legal malice. The State must carry the burden of proof of malice in all cases of criminal defamation."

In this Court, counsel for the defendant sets forth in brief:

"The basis of the defense's exception here is that the State must prove malice

in all cases of criminal defamation, not just in cases involving a qualified privilege. * * * In cases of qualified privilege the State must prove actual malice; in cases where the qualified privilege does not exist, the State must prove legal malice. The State must carry the burden of proof of malice in all defamation cases, not just in those defamation cases in which the defendant has a privilege.

"The above, and the trial judge's per curiam to this bill, * * * are good examples of the confusion which existed in the trial judge's mind about what the State had to do in this case to prove malice. As we have already stressed in this brief, the State introduced no evidence to show hatred, ill will or a wanton desire to injure the Judges on the part of the accused. What the State did introduce in evidence at the trial, over the objection of defense counsel, were several other privileged statements of the accused, also made, like the November 2 statement, in a reasonable belief of their truth and without malice. As he tells us in his Reasons for Judgment in this matter, the trial judge bases his holding of malice on Garrison's part on these other *privileged* statements. According to the trial judge, these other privileged statements 'show the state of mind that the Defendant had on and from the

date of the original defamation up to and including the date the last one was issued and convince me that it was a steadfast position of ill will and enmity arising out of a dislike of the fact that the Judges' refused to sign certain motions for him.'"

 As stated throughout this opinion, the defendant pleaded "qualified privilege," and the State contended that the statement of the defendant constituted malice in law and malice in fact. LSA–R.S. 14:49 provides that actual malice must be proved where a qualified privilege exists under certain enumerated circumstances; the statute does not restrict the proof of malice to extrinsic evidence. We find no prohibition in the law or in the jurisprudence which forbids the use of intrinsic evidence in a prosecution such as the instant one; neither do we find a limitation or restriction. The trial judge was therefore correct in qualifying Proposition of Law No. Seventeen. (See our discussion of Bill of Exceptions No. 6, 8, 9 and 11, supra.) Cf. Miller, Smith and Champagne v. Capital City Press, La.App., 142 So.2d 462; Jenkins v. D X Sunray Oil Co., 5 Cir., 297 F.2d 244.

The trial judge was correct in stating that after he had given his ruling to Proposition of Law No. Seventeen, he could not be compelled to expand to matters not re-

quested in the Proposition—the proof required in *all* cases of defamation.

*Bill of Exceptions No. 24 is without merit.*

Bill of Exceptions No. 25 was reserved to the ruling of the trial judge in denying defendant's Motion for a New Trial.

The Motion reurges all of the objections previously raised in Bills of Exceptions Nos. 1 through 24, and with respect to these matters nothing new is presented for our consideration. We have answered the arguments in discussing the bills, all of which we have found to be without merit.

 The Motion avers that there is no evidence in the record to support the judgment of the trial court. We have read the transcript of testimony (consisting of 741 pages), as well as the numerous pleadings hereinbefore discussed; we have also read the defendant's brief (94 pages) and the State's brief (43 pages), and we find that there is evidence to support the judgment. Where there is some evidence to sustain the conviction, this Court cannot pass upon the sufficiency thereof. State v. Copling, 242 La. 199, 135 So.2d 271; State v. McDonell, 208 La. 602, 23 So.2d 230. We are constrained to remark here that the length of this opinion is due to the extensiveness of the pleadings and the voluminous record attached; we are also impelled to state

that the learned trial judge and able counsel for both the State and the defendant have treated the matter with dexterity and completeness.

Counsel for the defendant argues in brief that there is not one scintilla of evidence to indicate that the accused made the statement herein involved without a reasonable belief of its truth. This contention would have to do with malice, which we have covered in our discussion of Bills of Exceptions Nos. 6, 8, 9, 11 and 24.[14] Cf. State v. Bienvenu, 36 La.Ann. 378.

Bill of Exceptions No. 25 is without merit.

Bill of Exceptions No. 26 was reserved when the trial court denied defendant's Motion in Arrest of Judgment.

14. It is appropriate to here observe that if defendant believed the statements he made, he could have pursued the following legal channels open to him:
(1) Legal proceedings to compel the judges to sign the orders.
(2) Charging the judges with a violation of the "Deadhead" statute, LSA–R.S. 14:138.
(3) Conducting an open hearing under the provisions of LSA–R.S. 15:17.1 concerning the alleged actions of the judges and whether or not there was a question

The Motion averred "that the entire proceedings against the defendant are null and void for the reasons that the statutes under which the bill of information is laid is unconstitutional and null and void and in violation of the First Amendment of the United States Constitution as a restriction on the freedom of speech."

We find no merit in the instant bill. In our disposition of Bill of Exceptions No. 3, we found LSA–R.S. 14:47–14:50 constitutional and not violative of the First Amendment to the United States Constitution.

Bill of Exceptions No. 26 is without merit.

For the reasons assigned, the conviction and sentence are affirmed.

HAMITER, J., concurs in the result.

of racketeer influences on the eight judges.
(4) Institution of removal from office proceedings under the provisions of Art. IX, Secs. 1 and 5, La.Const. of 1921.
(5) Availing himself of the services of the Judicial Council of the Supreme Court of Louisiana as provided by its Rule XX, Sec. 6. West's LSA, Vol. 8, Supplement for use during 1963.
The record reflects that defendant did not avail himself of the foregoing legal channels.