## GARRISON v. LOUISIANA.

No. 4.   Argued April 22, 1964.—Restored to the calendar for reargu-
ment June 22, 1964.—Reargued October 19, 1964.—Decided
November 23, 1964.

*Eberhard P. Deutsch* reargued the cause for appellant.
With him on the briefs was *René H. Himel, Jr.*

*Jack P. F. Gremillion,* Attorney General of Louisiana,
reargued the cause for appellee.   With him on the briefs
were *M. E. Culligan* and *John E. Jackson, Jr.,* Assistant
Attorneys General.

MR. JUSTICE BRENNAN delivered the opinion of the
Court.

Appellant is the District Attorney of Orleans Parish,
Louisiana.   During a dispute with the eight judges of

the Criminal District Court of the Parish, he held a press conference at which he issued a statement disparaging their judicial conduct. As a result, he was tried without a jury before a judge from another parish and convicted of criminal defamation under the Louisiana Criminal Defamation Statute.[1] The principal charges alleged to

[1] La. Rev. Stat., 1950, Tit. 14:

"§ 47. Defamation

"Defamation is the malicious publication or expression in any manner, to anyone other than the party defamed, of anything which tends:

"(1) To expose any person to hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse; or

"(2) To expose the memory of one deceased to hatred, contempt, or ridicule; or

"(3) To injure any person, corporation, or association of persons in his or their business or occupation.

"Whoever commits the crime of defamation shall be fined not more than three thousand dollars, or imprisoned for not more than one year, or both.

"§ 48. Presumption of malice

"Where a non-privileged defamatory publication or expression is false it is presumed to be malicious unless a justifiable motive for making it is shown.

"Where such a publication or expression is true, actual malice must be proved in order to convict the offender.

"§ 49. Qualified privilege

"A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:

"(1) Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same.

"(2) Where the publication or expression is a comment made in the reasonable belief of its truth, upon,

"(a) The conduct of a person in respect to public affairs; or

"(b) A thing which the proprietor thereof offers or explains to the public.

"(3) Where the publication or expression is made to a person interested in the communication, by one who is also interested or who

be defamatory were his attribution of a large backlog of pending criminal cases to the inefficiency, laziness, and excessive vacations of the judges, and his accusation that, by refusing to authorize disbursements to cover the expenses of undercover investigations of vice in New Orleans, the judges had hampered his efforts to enforce the vice laws. In impugning their motives, he said:

> "The judges have now made it eloquently clear where their sympathies lie in regard to aggressive vice investigations by refusing to authorize use of the DA's funds to pay for the cost of closing down the Canal Street clip joints . . . .

> ". . . This raises interesting questions about the racketeer influences on our eight vacation-minded judges." [2]

---

stands in such a relation to the former as to afford a reasonable ground for supposing his motive innocent.

"(4) Where the publication or expression is made by an attorney or party in a judicial proceeding."

La. Rev. Stat., 1962 Cum. Supp., Tit. 14:

"§ 50. Absolute privilege . . . ."

[2] The dispute between appellant and the judges arose over disbursements from a Fines and Fees Fund, which was to be used to defray expenses of the District Attorney's office; disbursements could be made only on motion of the District Attorney and approval by a judge of the Criminal District Court. After appellant took office, one of the incumbent judges refused to approve a disbursement from the Fund for furnishings for appellant's office. When the judge went on vacation prior to his retirement in September 1962, appellant obtained the approval of another judge, allegedly by misrepresenting that the first judge had withdrawn his objection. Thereupon, the eight judges, on October 5, 1962, adopted a rule that no further disbursements of the District Attorney from the Fund would be approved except with the concurrence of five of the eight judges. On October 26, 1962, the judges ruled that disbursements to pay appellant's undercover agents to conduct investigations of commercial vice in the Bourbon and Canal Street districts of New Orleans

The Supreme Court of Louisiana affirmed the conviction, 244 La. 787, 154 So. 2d 400. The trial court and the State Supreme Court both rejected appellant's contention that the statute unconstitutionally abridged his freedom of expression. We noted probable jurisdiction of the appeal. 375 U. S. 900. Argument was first heard in the 1963 Term, and the case was ordered restored to the calendar for reargument, 377 U. S. 986. We reverse.

## I.

In *New York Times Co. v. Sullivan*, 376 U. S. 254, we held that the Constitution limits state power, in a civil action brought by a public official for criticism of his official conduct, to an award of damages for a false statement "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U. S., at 279–280. At the outset, we must decide whether, in view of the differing history and purposes of criminal libel, the *New York Times* rule also limits state power to impose criminal sanctions for criticism of the official conduct of public officials. We hold that it does.

Where criticism of public officials is concerned, we see no merit in the argument that criminal libel statutes serve interests distinct from those secured by civil libel laws, and therefore should not be subject to the same limitations.[3] At common law, truth was no defense to criminal

would not be approved, and expressed doubt as to the legality of such a use of the Fund under the State Constitution. A few days later, on November 1, 1962, the judge, now retired, who had turned down the original motion issued a public statement criticizing appellant's conduct of the office of District Attorney. The next day, appellant held the press conference at which he made the statement for which he was prosecuted.

[3] In affirming appellant's conviction, before *New York Times* was handed down, the Supreme Court of Louisiana relied on statements in *Roth* v. *United States,* 354 U. S. 476, 486–487, and *Beauharnais* v.

libel. Although the victim of a true but defamatory publication might not have been unjustly damaged in reputation by the libel, the speaker was still punishable since the remedy was designed to avert the possibility that the utterance would provoke an enraged victim to a breach of peace. That argument is well stated in Edward Livingston's explanation of the defamation provisions of his proposed penal code for Louisiana:

> "In most cases, the connexion between cause and effect exists between the subject of this chapter and that of a subsequent one—Of Duels. Defamation, either real or supposed, is the cause of most of those combats which no laws have yet been able to suppress. If lawgivers had originally condescended to pay some attention to the passions and feelings of those for whom they were to legislate, these appeals to arms would never have usurped a power superior to the laws; but by affording no satisfaction for the wounded feelings of honour, they drove individuals to avenge all wrongs of that description, denied a place in the code of criminal law. Insults formed a title in that of honour, which claimed exclusive jurisdiction of this offence." Livingston, A System of Penal Law for the State of Louisiana, at 177 (1833).[4]

*Illinois*, 343 U. S. 250, 266, to the effect that libelous utterances are not within the protection of the First and Fourteenth Amendments, and hence can be punished without a showing of clear and present danger. 244 La., at 833–834, 154 So. 2d, at 416–417. For the reasons stated in *New York Times*, 376 U. S., at 268–269, nothing in *Roth* or *Beauharnais* forecloses inquiry into whether the use of libel laws, civil or criminal, to impose sanctions upon criticism of the official conduct of public officials transgresses constitutional limitations protecting freedom of expression. Whether the libel law be civil or criminal, it must satisfy relevant constitutional standards.

[4] Livingston's Code was not adopted, and is not reflected in the current Louisiana statute. His suggested provisions for defamation appear at pp. 421–425. Of particular interest are Art. 369, exculpat-

Even in Livingston's day, however, preference for the civil remedy, which enabled the frustrated victim to trade chivalrous satisfaction for damages, had substantially eroded the breach of the peace justification for criminal libel laws. In fact, in earlier, more violent, times, the civil remedy had virtually pre-empted the field of defamation; except as a weapon against seditious libel, the criminal prosecution fell into virtual desuetude.[5] Changing mores and the virtual disappearance of criminal libel prosecutions lend support to the observation that ". . . under modern conditions, when the rule of law is generally accepted as a substitute for private physical measures, it can hardly be urged that the maintenance of peace requires a criminal prosecution for private defamation." Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 924 (1963).[6] The absence in the Proposed Official Draft of the Model Penal Code of the American Law Institute of any criminal libel statute on the Louisiana pattern reflects this modern consensus. The ALI Reporters, in explaining the omission, gave cogent evidence of the obsolescence of Livingston's justification:

"It goes without saying that penal sanctions cannot be justified merely by the fact that defamation is evil

ing true statements of fact or incorrect opinions as to the qualifications of any person for public office, and Art. 386 (2), exculpating even mistaken observations on the tendencies or motives of official acts of public officers, but not exculpating false allegations of such motives as would be criminal.

[5] 5 Holdsworth, History of English Law, 207–208 (2d ed. 1937); Kelly, Criminal Libel and Free Speech, 6 Kan. L. Rev. 295, 296–303 (1958).

[6] See the letter of Mr. Justice Jackson, when Attorney General of the United States, dated June 11, 1940, and addressed to Senator Millard E. Tydings, 87 Cong. Rec. 5836–5837, in which he stated that the policy of the Attorneys General of the United States was not to prosecute for criticism of public officials.

or damaging to a person in ways that entitle him to maintain a civil suit. Usually we reserve the criminal law for harmful behavior which exceptionally disturbs the community's sense of security. . . . It seems evident that personal calumny falls in neither of these classes in the U. S. A., that it is therefore inappropriate for penal control, and that this probably accounts for the paucity of prosecutions and the near desuetude of private criminal libel legislation in this country. . . ." Model Penal Code, Tent. Draft No. 13, 1961, § 250.7, Comments, at 44.

The Reporters therefore recommended only narrowly drawn statutes designed to reach words tending to cause a breach of the peace, such as the statute sustained in *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, or designed to reach speech, such as group vilification, "especially likely to lead to public disorders," such as the statute sustained in *Beauharnais* v. *Illinois,* 343 U. S. 250. Model Penal Code, *supra,* at 45. But Louisiana's rejection of the clear-and-present-danger standard as irrelevant to the application of its statute, 244 La., at 833, 154 So. 2d, at 416, coupled with the absence of any limitation in the statute itself to speech calculated to cause breaches of the peace, leads us to conclude that the Louisiana statute is not this sort of narrowly drawn statute.

We next consider whether the historical limitation of the defense of truth in criminal libel to utterances published "with good motives and for justifiable ends" [7]

---

[7] The following jurisdictions have constitutional or statutory provisions which make truth a defense if published with good motives and for justifiable ends, or some variant thereof:

Alaska Stat., 1962, § 11.15.320; Ariz. Rev. Stat. Ann., 1956, § 13–353; Cal. Const., 1879, Art. 1, § 9; Cal. Pen. Code, 1955, § 251; D. C. Code Ann., 1961, § 22–2303; Fla. Const., 1885, Declaration of Rights, § 13; Hawaii Rev. Laws, 1955, § 294–6; Idaho Code, 1948,

should be incorporated into the *New York Times* rule as it applies to criminal libel statutes; in particular, we must ask whether this history permits negating the truth defense, as the Louisiana statute does, on a showing of

§ 18–4803; Ill. Const., 1870, Art. 2, § 4; Ill. Rev. Stat., 1963, Tit. 38, § 27–2; Iowa Const., 1846, Art. I, § 7; Iowa Code, 1962, § 737.4; Kan. Bill of Rights, Const., 1859, § 11; Kan. Gen. Stat. Ann., 1949, § 21–2403; Mass. Gen. Laws Ann., 1959, c. 278, § 8 (without "actual malice"); Mich. Const., 1963, Art. I, § 19; Minn. Stat., 1961, § 634.05; Miss. Const., 1890, Art. 3, § 13; Miss. Code, 1942 (recompiled 1956), § 2269; Mont. Const., 1889, Art. III, § 10; Mont. Rev. Codes Ann., 1947, § 94–2804; Nev. Const., 1864, Art. I, § 9; Nev. Rev. Stat., 1961, § 200.510.3; N. J. Const., 1947, Art. 1, ¶ 6; N. Y. Const., 1938, Art. I, § 8; N. Y. Pen. Code, § 1342; N. D. Const., 1889, Art. I, § 9; N. D. Cent. Code, 1960, § 12–28–04; Ohio Const., 1851, Art. I, § 11; Okla. Const., 1907, Art. 2, § 22; Okla. Stat., 1951, Tit. 21, § 774; Ore. Rev. Stat., 1953, § 163.420; R. I. Const., 1843, Art. I, § 20; R. I. Gen. Laws Ann., 1956, § 9–6–9; S. D. Const., 1889, Art. VI, § 5; S. D. Code, 1939, § 13.3406; Utah Const., 1895, Art I, § 15; Utah Code Ann., 1953, §.77–31–30; Wash. Rev. Code, 1951, § 9.58.020; Wis. Const., 1848, Art. I, § 3; Wis. Stat., 1961, § 942.01 (3); Wyo. Const., 1890, Art. 1, § 20. Cf. England, Lord Campbell's Act, 6 & 7 Vict., c. 96, § 6 (1843) (for the public benefit).

In the following jurisdictions truth does operate as a complete defense:

Colo. Const., 1876, Art. II, § 10; Colo. Rev. Stat. Ann., 1953, § 40–8–13; *Bearman* v. *People*, 91 Colo. 486, 493, 16 P. 2d 425, 427 (1932); Ind. Const., 1851, Art. 1, § 10; *State* v. *Bush*, 122 Ind. 42, 23 N. E. 677 (1890); Mo. Const., 1945, Art. I, § 8; Mo. Rev. Stat., 1959, § 559.440; Neb. Const., 1875, Art. I, § 5; Neb. Rev. Stat., 1943 (1956 reissue), § 28–440; *Razee* v. *State*, 73 Neb. 732, 103 N. W. 438 (1905); N. M. Const., 1911, Art. II, § 17; N. M. Stat. Ann., 1953 (1964 replacement), § 40A–11–1 (false and malicious statement); N. C. Gen. Stat., 1953. § 15–168; S. C. Const., 1895, Art. I, § 21; S. C. Code, 1962, § 16–161; Vt. Stat. Ann., 1958, Tit. 13, § 6560.

The following jurisdictions allow greater scope for the defense of truth where criticism of the official conduct of public officials is concerned:

Ala. Const., 1901, Art. 1, § 12 (but Ala. Code, 1940, Tit. 14, § 350 makes truth a defense); Del. Const., 1897, Art. 1, § 5; Del. Code

malice in the sense of ill-will. The "good motives" restriction incorporated in many state constitutions and statutes to reflect Alexander Hamilton's unsuccessfully urged formula in *People* v. *Croswell,* 3 Johns. Cas. 337, 352 (N. Y. Supreme Court 1804), liberalized the common-law rule denying any defense for truth. See Ray, Truth: A Defense to Libel, 16 Minn. L. Rev. 43, 46–49 (1931); Kelly, Criminal Libel and Free Speech, 6 Kan. L. Rev. 295, 326–328 (1958). We need not be concerned whether this limitation serves a legitimate state interest to the extent that it reflects abhorrence that "a man's forgotten misconduct, or the misconduct of a relation, *in which the public had no interest,* should be wantonly raked up, and published to the world, on the ground of its being true." 69 Hansard, Parliamentary Debates 1230 (3d series) (H. L. June 1, 1843) (Report of Lord Campbell) (emphasis supplied).[8] In any event, where the criticism is of

---

Ann., 1953, Tit. 11, § 3506; Ky. Const., 1891, § 9; Me. Const., 1820, Art. I, § 4; Me. Rev. Stat., 1954, c. 130, § 34; *State* v. *Burnham,* 9 N. H. 34, 31 Am. Dec. 217 (1837); Pa. Const., 1874, Art. 1, § 7; Tenn. Const., 1870, Art. 1, § 19; Tenn. Code Ann., 1955, §§ 39–2704, 23–2603; Tex. Const., 1876, Art. 1, § 8; Tex. Code Crim. Proc. Ann., 1954, Art. 13; Tex. Pen. Code Ann., 1953, Arts. 1290 (1), 1290 (4).

The following jurisdictions have constitutional or statutory provisions under which evidence of the truth may be introduced, but it is unclear whether this operates as a complete defense:

Ark. Const., 1874, Art. 2, § 6; Ark. Stat., 1947 (1964 replacement), Tit. 41, § 2403; Conn. Const., 1818, Art. First, § 7; Ga. Const., 1877, § 2–201; Ga. Code Ann., 1953, § 26–2103; Md. Code Ann., 1957, Art. 75, § 5; Va. Code Ann., 1950 (1960 replacement), §§ 18.1–255, 18.1–256.

In one jurisdiction there is no authority in point. See *State* v. *Payne,* 87 W. Va. 102, 104 S. E. 288 (1920).

[8] We recognize that different interests may be involved where purely private libels, totally unrelated to public affairs, are concerned; therefore, nothing we say today is to be taken as intimating any views as to the impact of the constitutional guarantees in the discrete area of purely private libels.

public officials and their conduct of public business, the
interest in private reputation is overborne by the larger
public interest, secured by the Constitution, in the dis-
semination of truth.[9]  In short, we agree with the New
Hampshire court in *State* v. *Burnham,* 9 N. H. 34, 42–43,
31 Am. Dec. 217, 221 (1837):

> "If upon a lawful occasion for making a publication,
> he has published the truth, and no more, there is no
> sound principle which can make him liable, even if
> he was actuated by express malice. . . .
>
> "It has been said that it is lawful to publish truth
> from good motives, and for justifiable ends.  But
> this rule is too narrow.  If there is a lawful occa-
> sion—a legal right to make a publication—and the
> matter true, the end is justifiable, and that, in such
> case, must be sufficient."

Moreover, even where the utterance is false, the great
principles of the Constitution which secure freedom of
expression in this area preclude attaching adverse conse-
quences to any except the knowing or reckless falsehood.
Debate on public issues will not be uninhibited if the
speaker must run the risk that it will be proved in court
that he spoke out of hatred; even if he did speak out
of hatred, utterances honestly believed contribute to the
free interchange of ideas and the ascertainment of
truth.  Under a rule like the Louisiana rule, permitting
a finding of malice based on an intent merely to inflict
harm, rather than an intent to inflict harm through
falsehood, "it becomes a hazardous matter to speak out
against a popular politician, with the result that the
dishonest and incompetent will be shielded."  Noel, Def-

---

[9] Even the law of privacy, which evolved to meet Lord Campbell's
reservations, recognizes severe limitations where public figures or
newsworthy facts are concerned.  See *Sidis* v. *F-R Pub. Corp.,* 113
F. 2d 806, 809–810 (C. A. 2d Cir. 1940).

amation of Public Officers and Candidates, 49 Col. L. Rev. 875, 893 (1949). Moreover, "[i]n the case of charges against a popular political figure . . . it may be almost impossible to show freedom from ill-will or selfish political motives." *Id.,* at 893, n. 90. Similar considerations supported our holdings that federal officers enjoy an absolute privilege for defamatory publication within the scope of official duty, regardless of the existence of malice in the sense of ill-will. *Barr* v. *Matteo,* 360 U. S. 564; *Howard* v. *Lyons,* 360 U. S. 593; cf. *Gregoire* v. *Biddle,* 177 F. 2d 579 (C. A. 2d Cir. 1949). What we said of Alabama's civil libel law in *New York Times,* 376 U. S., at 282–283, applies equally to the Louisiana criminal libel rule: "It would give public servants an unjustified preference over the public they serve, if critics of official conduct did not have a fair equivalent of the immunity granted to the officials themselves."

We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in *New York Times,* 376 U. S., at 279–280, apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ". . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ," 376 U. S., at 271–272, only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is

more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan,* 376 U. S., at 270.

The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088–1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . ." *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.

76

## II.

We find no difficulty in bringing the appellant's statement within the purview of criticism of the official conduct of public officials, entitled to the benefit of the *New York Times* rule. As the Louisiana Supreme Court viewed the statement, it constituted an attack upon the personal integrity of the judges, rather than on official conduct. In sustaining the finding of the trial court that the appellant's statement was defamatory, the Louisiana Supreme Court held that ". . . the use of the words 'racketeer influences' when applied to anyone suggests and imputes that he has been influenced to practice fraud, deceit, trickery, cheating, and dishonesty"; that "The expression that the judges have enjoyed 300 days vacation out of 19 months suggests and connotes a violation of the 'Deadhead' statute, LSA–R. S. 14:138, Public Payroll Fraud"; that "Other expressions set out in the Bill of Information connote malfeasance in office. LSA–R. S. 14:134; Art. IX, Sec. 1, La. Const. of 1921." The court concluded that "Defendant's expressions . . . are not criticisms of a court trial or of the manner in which any one of the eight judges conducted his court when in session. The expressions charged contain personal attacks upon the integrity and honesty of the eight judges . . . ." 244 La., at 834–835, 154 So. 2d, at 417–418.

We do not think, however, that appellant's statement may be considered as one constituting only a purely private defamation. The accusation concerned the judges' conduct of the business of the Criminal District Court.[10]

---

[10] In view of our result, we do not decide whether appellant's statement was factual or merely comment, or whether a State may provide any remedy, civil or criminal, if defamatory comment alone, however vituperative, is directed at public officials. The Louisiana courts held that the privilege for fair comment was excluded in the present case by malice or lack of reasonable care, and not by the

Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.[11] As the Kansas Supreme Court said in *Coleman* v. *MacLennan*, speaking of candidates:

> "Manifestly a candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office, and the liberal rule requires no more. But in measuring the extent of a candidate's profert of character it should always be remembered that the people have good authority for believing that grapes do not grow on thorns nor figs on thistles." 78 Kan. 711, 739, 98 P. 281, 291 (1908).

### III.

Applying the principles of the *New York Times* case, we hold that the Louisiana statute, as authoritatively interpreted by the Supreme Court of Louisiana, incorporates constitutionally invalid standards in the context of criticism of the official conduct of public officials.

---

addition of factual assertions. For different formulations of comment, in the context of the common law fair-comment rule, see 1 Harper and James, The Law of Torts, § 5.28, at 458 (1956); Note, Fair Comment, 62 Harv. L. Rev. 1207, 1213 (1949); Restatement, Torts, § 606, Comment *b*, § 567 (1938).

[11] See, *e. g.*, Vernon's Tex. Pen. Code Ann., 1953, Art. 1290 (2).

For, contrary to the *New York Times* rule, which absolutely prohibits punishment of truthful criticism, the statute directs punishment for true statements made with "actual malice," see LSA–R. S. § 14:48; *State* v. *Cox*, 246 La. 748, 756, 167 So. 2d 352, 355 (1964), handed down after the *New York Times* decision; Bennett, The Louisiana Criminal Code, 5 La. L. Rev. 6, 34 (1942). And "actual malice" is defined in the decisions below to mean "hatred, ill will or enmity or a wanton desire to injure . . . ." 244 La., at 851, 154 So. 2d, at 423. The statute is also unconstitutional as interpreted to cover false statements against public officials. The *New York Times* standard forbids the punishment of false statements, unless made with knowledge of their falsity or in reckless disregard of whether they are true or false. But the Louisiana statute punishes false statements without regard to that test if made with ill-will; even if ill-will is not established, a false statement concerning. public officials can be punished if not made in the reasonable belief of its truth. The Louisiana Supreme Court affirmed the conviction solely on the ground that the evidence sufficed to support the trial court's finding of ill-will, enmity, or a wanton desire to injure. But the trial court also rested the conviction on additional findings that the statement was false and not made in the reasonable belief of its truth. The judge said:

> "It is inconceivable to me that the Defendant could have had a reasonable belief, which could be defined as an honest belief, that not one but all eight of these Judges of the Criminal District Court were guilty of what he charged them with in the defamatory statement. These men have been honored . . . with very high offices . . . . It is inconceivable to me that all of them could have been guilty of all of the accusations made against them. Therefore, I do

not believe that the qualified privilege under LSA–
R. S., Title 14, Section 49, is applicable . . . ."

This is not a holding applying the *New York Times*
test. The reasonable-belief standard applied by the trial
judge is not the same as the reckless-disregard-of-truth
standard. According to the trial court's opinion, a rea-
sonable belief is one which "an ordinarily prudent man
might be able to assign a just and fair reason for"; the
suggestion is that under this test the immunity from crim-
inal responsibility in the absence of ill-will disappears on
proof that the exercise of ordinary care would have re-
vealed that the statement was false. The test which we
laid down in *New York Times* is not keyed to ordinary
care; defeasance of the privilege is conditioned, not on
mere negligence, but on reckless disregard for the truth.

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS
joins, concurring.

For reasons stated at greater length in my opinions
concurring in *New York Times Co.* v. *Sullivan*, 376 U. S.
254, 293, and dissenting in *Beauharnais* v. *Illinois*, 343
U. S. 250, 267, as well as in the opinion of MR. JUSTICE
DOUGLAS in this case, *infra*, p. 80, I concur in reversing
the conviction of appellant Garrison, based as it is purely
on his public discussion and criticism of public officials.
I believe that the First Amendment, made applicable to
the States by the Fourteenth, protects every person from
having a State or the Federal Government fine, imprison,
or assess damages against him when he has been guilty
of no conduct, see *Giboney* v. *Empire Storage & Ice Co.*,
336 U. S. 490, 498, other than expressing an opinion, even
though others may believe that his views are unwhole-
some, unpatriotic, stupid or dangerous. I believe that
the Court is mistaken if it thinks that requiring proof that

statements were "malicious" or "defamatory" will really create any substantial hurdle to block public officials from punishing those who criticize the way they conduct their office. Indeed, "malicious," "seditious," and other such evil-sounding words often have been invoked to punish people for expressing their views on public affairs. Fining men or sending them to jail for criticizing public officials not only jeopardizes the free, open public discussion which our Constitution guarantees, but can wholly stifle it. I would hold now and not wait to hold later, compare *Betts* v. *Brady,* 316 U. S. 455, overruled in *Gideon* v. *Wainwright,* 372 U. S. 335, that under our Constitution there is absolutely no place in this country for the old, discredited English Star Chamber law of seditious criminal libel.

MR. JUSTICE DOUGLAS, whom MR. JUSTICE BLACK joins, concurring.

I am in hearty agreement with the conclusion of the Court that this prosecution for a seditious libel was unconstitutional. Yet I feel that the gloss which the Court has put on "the freedom of speech" in the First Amendment to reach that result (and like results in other cases) makes that basic guarantee almost unrecognizable.[1]

Recently in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, a majority of the Court held that criticism of an

---

[1] The Constitution says in the First Amendment that "Congress shall make no law . . . abridging the freedom of speech"; and the Due Process Clause of the Fourteenth Amendment puts the States under the same restraint. There is one school of thought, so far in the minority, which holds that the due process freedom of speech honored by the Fourteenth Amendment is a watered-down version of the First Amendment freedom of speech. See my Brother HARLAN in *Roth* v. *United States,* 354 U. S. 476, 500–503. While that view has never obtained, the construction which the majority has given the First Amendment has been burdened with somewhat the same kind of qualifications and conditions.

official for official conduct was protected from state civil libel laws by the First and Fourteenth Amendments, unless there was proof of actual malice. *Id.*, at 279. We now hold that proof of actual malice is relevant to seditious libel—that seditious libel will lie for a knowingly false statement or one made with reckless disregard of the truth.

If malice is all that is needed, inferences from facts as found by the jury will easily oblige. How can we sit in review on a cold record and find no evidence of malice (cf. *New York Times Co.* v. *Sullivan*, 376 U. S., at 285–288) when it is the commonplace of life that heat and passion subtly turn to malice in actual fact? If "reckless disregard of the truth" is the basis of seditious libel, that nebulous standard could be easily met. The presence of "actual malice" is made critical in seditious libel, as well as in civil actions involving charges against public officials, when in truth there is nothing in the Constitution about it, any more than there is about "clear and present danger."

While the First Amendment remains the same, the gloss which the Court has written on it in this field of the discussion of public issues robs it of much vitality.

Why does "the freedom of speech" that the Court is willing to protect turn out to be so pale and tame?

It is because, as my Brother BLACK has said,[2] the Bill of Rights is constantly watered down through judi-

---

[2] The Bill of Rights and the Federal Government, in The Great Rights, p. 60 (Cahn ed. 1963):

"In reality this [balancing] approach returns us to the state of legislative supremacy which existed in England and which the Framers were so determined to change once and for all. On the one hand, it denies the judiciary its constitutional power to measure acts of Congress by the standards set down in the Bill of Rights. On the other hand, though apparently reducing judicial powers by saying that acts of Congress may be held unconstitutional only when they are found to have no rational legislative basis, this approach really gives

cial "balancing" of what the Constitution says and what judges think is needed for a well-ordered society.

As Irving Brant recently said: "The balancing test developed in recent years by our Supreme Court does not *disarm* the Government of power to *trench upon* the field in which the Constitution says 'Congress shall make no law.' The balancing test does exactly what is done by its spiritual parent, the British 'common law of seditious libel,' under which (to repeat the words of May), 'Every one was a libeler who outraged the sentiments of the dominant party.' " Seditious Libel: Myth and Reality, 39 N. Y. U. L. Rev. 1, 18–19 (1964).

*Beauharnais* v. *Illinois*, 343 U. S. 250, a case decided by the narrowest of margins, should be overruled as a misfit in our constitutional system and as out of line with the dictates of the First Amendment. I think it is time to face the fact that the only line drawn by the Constitution is between "speech" on the one side and conduct or overt acts on the other. The two often do blend. I have expressed the idea before: "Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it." *Roth* v. *United States*, 354 U. S., at 514 (dissenting opinion). Unless speech is so brigaded with overt acts of that kind there is nothing that may be punished; and no semblance of such a case is made out here.

I think little need be added to what Mr. Justice Holmes said nearly a half century ago:

"I wholly disagree with the argument of the Government that the First Amendment left the common

---

the Court, along with Congress, a greater power, that of overriding the plain commands of the Bill of Rights on a finding of weighty public interest. In effect, it changes the direction of our form of government from a government of limited powers to a government in which Congress may do anything that courts believe to be 'reasonable.' "

law as to seditious libel in force. History seems to me against the notion. I had conceived that the United States through many years had shown its repentance for the Sedition Act of 1798,[3] by repaying fines that it imposed." *Abrams v. United States,* 250 U. S. 616, 630 (dissenting opinion).

The philosophy of the Sedition Act of 1798 which punished "false, scandalous and malicious" writings (1 Stat. 596) is today allowed to be applied by the States. Yet Irving Brant has shown that seditious libel was "entirely the creation of the Star Chamber."[4] It is disquieting to know that one of its instruments of destruction is abroad in the land today.

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS, CONCURRING.

Excerpt from Madison's Address, January 23, 1799:

"The sedition act presents a scene which was never expected by the early friends of the Constitution. It was then admitted that the State sovereignties were only diminished by powers specifically enumerated, or necessary to carry the specified powers into effect. Now, Federal authority is deduced from implication; and from the

---

[3] Madison's views on the Sedition Act—a federal enactment—are relevant here, now that the First Amendment is applicable to the States. I have therefore appended his views as an Appendix.

[4] 39 N. Y. U. L. Rev. 1, 11. "What is called today the common-law doctrine of seditious libel is in fact the creation of the Court of Star Chamber, the most iniquitous tribunal in English history. It has been injected into the common law solely by the fiat of Coke and by subsequent decisions and opinions of English judges who perpetuated the vicious procedures by which the Star Chamber stifled criticism of the government and freedom of political opinion. If seditious libel has any genuine common-law affiliation, it is by illegitimate descent from constructive treason and heresy, both of which are totally repugnant to the Constitution of the United States." Brant, *supra,* at 5.

existence of State law, it is inferred that Congress possess a similar power of legislation; whence Congress will be endowed with a power of legislation in all cases whatsoever, and the States will be stripped of every right reserved, by the concurrent claims of a paramount Legislature.

"The sedition act is the offspring of these tremendous pretensions, which inflict a death-wound on the sovereignty of the States.

"For the honor of American understanding, we will not believe that the people have been allured into the adoption of the Constitution by an affectation of defining powers, whilst the *preamble* would admit a construction which would erect the will of Congress into a power paramount in all cases, and therefore limited in none. On the contrary, it is evident that the objects for which the Constitution was formed were deemed attainable only by a particular enumeration and specification of each power granted to the Federal Government; reserving all others to the people, or to the States. And yet it is in vain we search for any specified power embracing the right of legislation against the freedom of the press.

"Had the States been despoiled of their sovereignty by the generality of the preamble, and had the Federal Government been endowed with whatever they should judge to be instrumental towards union, justice, tranquillity, common defence, general welfare, and the preservation of liberty, nothing could have been more frivolous than an enumeration of powers.

"It is vicious in the extreme to calumniate meritorious public servants; but it is both artful and vicious to arouse the public indignation against calumny in order to conceal usurpation. Calumny is forbidden by the laws, usurpation by the Constitution. Calumny injures individuals, usurpation, States. Calumny may be redressed

by the common judicatures; usurpation can only be controlled by the act of society. Ought *usurpation,* which is most mischievous, to be rendered less hateful by *calumny,* which, though injurious, is in a degree less pernicious? But the laws for the correction of calumny were not defective. Every libellous writing or expression might receive its punishment in the State courts, from juries summoned by an officer, who does not receive his appointment from the President, and is under no influence to court the pleasure of Government, whether it injured public officers or private citizens. Nor is there any distinction in the Constitution empowering Congress exclusively to punish calumny directed against an officer of the General Government; so that a construction assuming the power of protecting the reputation of a citizen officer will extend to the case of any other citizen, and open to Congress a right of legislation in every conceivable case which can arise between individuals.

"In answer to this, it is urged that every Government possesses an inherent power of self-preservation, entitling it to do whatever it shall judge necessary for that purpose.

"This is a repetition of the doctrine of implication and expediency in different language, and admits of a similar and decisive answer, namely, that as the powers of Congress are defined, powers inherent, implied, or expedient, are obviously the creatures of ambition; because the care expended in defining powers would otherwise have been superfluous. Powers extracted from such sources will be indefinitely multiplied by the aid of armies and patronage, which, with the impossibility of controlling them by any demarcation, would presently terminate reasoning, and ultimately swallow up the State sovereignties.

"So insatiable is a love of power that it has resorted to a distinction between the freedom and licentiousness of

86

the press for the purpose of converting the third amendment* of the Constitution, which was dictated by the most lively anxiety to preserve that freedom, into an instrument for abridging it. Thus usurpation even justifies itself by a precaution against usurpation; and thus an amendment universally designed to quiet every fear is adduced as the source of an act which has produced general terror and alarm.

"The distinction between liberty and licentiousness is still a repetition of the Protean doctrine of implication, which is ever ready to work its ends by varying its shape. By its help, the judge as to what is licentious may escape through any constitutional restriction. Under it men of a particular religious opinion might be excluded from office, because such exclusion would not amount to an establishment of religion, and because it might be said that their opinions are licentious. And under it Congress might denominate a religion to be heretical and licentious, and proceed to its suppression. Remember that precedents once established are so much positive power; and that the nation which reposes on the pillow of political confidence, will sooner or later end its political existence in a deadly lethargy. Remember, also, that it is to the press mankind are indebted for having dispelled the clouds which long encompassed religion, for disclosing her genuine lustre, and disseminating her salutary doctrines.

"The sophistry of a distinction between the liberty and the licentiousness of the press is so forcibly exposed in a late memorial from our late envoys to the Minister of the French Republic, that we here present it to you in their own words:

" 'The genious of the Constitution, and the opinion of the people of the United States, cannot be overruled by

---

*The First Amendment was Article Third in those submitted by Congress to the States on September 25, 1789.

those who administer the Government. Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.* No regulations exist which enable the Government to suppress whatever calumnies or invectives any individual may choose to offer to the public eye, or to punish such calumnies and invectives otherwise than by a legal prosecution in courts which are alike open to all who consider themselves as injured.'

"As if we were bound to look for security from the personal probity of Congress amidst the frailties of man, and not from the barriers of the Constitution, it has been urged that the accused under the sedition act is allowed to prove the truth of the charge. This argument will not for a moment disguise the unconstitutionality of the act, if it be recollected that opinions as well as facts are made punishable, and that the truth of an opinion is not susceptible of proof. By subjecting the truth of opinion to the regulation, fine, and imprisonment, to be inflicted by those who are of a different opinion, the free range of the human mind is injuriously restrained. The sacred obligations of religion flow from the due exercise of opinion, in the solemn discharge of which man is accountable to

his God alone; yet, under this precedent the truth of religion itself may be ascertained, and its pretended licentiousness punished by a jury of a different creed from that held by the person accused. This law, then, commits the double sacrilege of arresting reason in her progress towards perfection, and of placing in a state of danger the free exercise of religious opinions. But where does the Constitution allow Congress to create crimes and inflict punishment, provided they allow the accused to exhibit evidence in his defense? This doctrine, united with the assertion, that sedition is a common law offence, and therefore within the correcting power of Congress, opens at once the hideous volumes of penal law, and turns loose upon us the utmost invention of insatiable malice and ambition, which, in all ages, have debauched morals, depressed liberty, shackled religion, supported despotism, and deluged the scaffold with blood." VI Writings of James Madison, 1790–1802, pp. 333–337 (Hunt ed. 1906).

MR. JUSTICE GOLDBERG, concurring.

I agree with the Court that there is "no difficulty in bringing the appellant's statement within the purview of criticism of the official conduct of public officials . . . ." *Ante,* at 76. In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 297, I expressed my conviction "that the Constitution accords citizens and press an unconditional freedom to criticize official conduct." *Id.,* at 305. *New York Times* was a civil libel case; this is a criminal libel prosecution. In my view, "[i]f the rule that libel on government has no place in our Constitution is to have real meaning, then libel [criminal or civil] on the official conduct of the governors likewise can have no place in our Constitution." *Id.,* at 299.