**Otto F. OTEPKA**

v.

**The NEW YORK TIMES COMPANY, a New York corporation.**

Civ. No. 71–62–T.

United States District Court,
D. Maryland.

Nov. 12, 1973.

Joseph I. Huesman and Lerch & Huesman, Baltimore, Md., and Paul G. Kachulis and Kachulis & Copetas, Pittsburgh, Pa., for plaintiff.

Francis D. Murnaghan, Jr., and Douglas D. Connah, Jr., Baltimore, Md., for defendant.

THOMSEN, District Judge.

MEMORANDUM ON MOTION FOR DIRECTED VERDICT

During all material times plaintiff was a public official, and the alleged libel related to his official conduct.

The applicable test of liability, therefore, is the rule stated in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and in later cases which have applied and clarified that rule. In the leading case the Court said:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not. * * * " 376 U.S. at 279, 280, 84 S. Ct. at 726.

■ Recovery may be allowed only where there is clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not. New York Times Co. v. Sullivan, supra, at 285, 84 S.Ct. 710; Beckley Newspaper Corp. v. Hanks, 389 U.S. 81, at 83–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Rosenbloom v. Metromedia, 403 U.S. 29, at 52 et seq., 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

"And since '. . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive" . . . ,' 376 U.S., at 271–272, 84 S.Ct., at 721, only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include

vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan, 376 U.S., at 270, 84 S.Ct., at 721." Garrison v. Louisiana, 379 U.S. 64, at 74, 75, 85 S.Ct. 209, at 216, 13 L.Ed.2d 125 (1964).

■ The "cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, at 731, 88 S.Ct. 1323, at 1325, 20 L.Ed.2d 262 (1968); Rosenbloom v. Metromedia, supra, 403 U.S. at 55, 91 S.Ct. 1811.

### The Alleged Libel

On February 15, 1970, The New York Times in its Sunday Magazine published an article written by Robert Sherrill, a freelance writer, entitled "Birch Bayh Isn't a Household Word—Yet". The article referred to the senator's vote in 1969 to confirm the appointment of Otepka to the Subversive Activities Control Board. On February 18, 1970, Otepka wrote a letter to The New York Times claiming that there were inaccuracies in the references to him. The Times informed Sherrill of the letter and offered him an opportunity to reply. On March 15, 1970, The Times published both Otepka's letter and Sherrill's reply in the Sunday Magazine section. Otepka claims to have been libeled by the portion of the reply where Sherrill wrote:

"Otepka was charged with, and on Nov. 5, 1963, dismissed for violating three regulations governing the release, declassification and mutilation of Government documents."

Otepka bases his claim on the fact that charges of mutilation of documents, which would be felonious conduct under 18 U.S.C.A. § 2071, though once leveled at him and found by the original hear-

ing officer to have been committed by him, were eventually dropped by the State Department, and that the final decision—reprimand, reduction in rank, and removal from any personnel security duty—was based only on a finding of unauthorized release of classified documents.

## Historical Facts

Otepka became a security officer in the State Department in 1953. By 1963, he had become the Department's chief security evaluator. In that year, he became a central figure in a controversy between the Internal Security Subcommittee of the Senate Judiciary Committee and various officers of the Department of State. The Subcommittee was investigating the Department's practice of occasionally waiving normal security investigative procedures. Controversy centered around Otepka because he furnished to the Subcommittee or its counsel classified documents dealing with the subject of the Subcommittee's investigation without the permission of his superior officers.

The controversy raised troublesome and interesting constitutional questions, on which the division of opinion developed on ideological grounds—those on the left generally supporting the State Department, those on the right supporting Otepka. There was public interest in the matter and extensive newspaper coverage.

In 1963 the Department charged Otepka with release, declassification and mutilation of classified documents. The mutilation of such documents is a violation of 18 U.S.C.A. § 2071, but no criminal charge was ever brought. Otepka was given an opportunity to reply to the charges and did so; he did not request a hearing. The original decision was that he should be dismissed for release, declassification and mutilation of classified documents. Otepka appealed; his appeal stayed operation of the decision, but he was given only work of a trifling nature, fairly referred to by him as "made-work". By agreement of the parties, the decision on the appeal was delayed for over three years, awaiting the report of the Subcommittee. Before the appeal reached Secretary Rusk, the charges of declassification and mutilation were dropped. The decision of the Secretary in December 1967 was that Otepka had breached the Code of Ethics of the Department by releasing the documents; that Otepka be severely reprimanded, reduced from GS 15 to GS 14, step one, and transferred to duties which did not involve administration of personnel security functions.

Otepka appealed to the Civil Service Commission, which affirmed the Secretary in September 1968.

Meanwhile Otepka took advantage of his accumulated annual leave, and some advanced leave. When that was used up in 1968, he took leave without pay.

In March 1969, President Nixon sent to the Senate for confirmation his appointment of Otepka to be a member of the Subversive Activities Control Board. After further controversy, the appointment was confirmed.

The hearings in the State Department on the charges against Otepka were held in camera, but the results of the hearings were announced, and Otepka and his counsel made public statements from time to time, which were published by The Times and other papers. At all times during the controversy, The Times supported the State Department as against Otepka and the members of the Subcommittee, both editorially and in signed articles. But The Times carried full and fair articles presenting the statements made by Otepka and the senators who supported Otepka, as well as the report of the Subcommittee.

The Times also opposed the confirmation of Otepka to the Subversive Activities Control Board; indeed The Times had opposed the continuation of that Board in 1968, which it called a "shabby deal" between President Johnson and Senator Dirksen.

In the controversy between the State Department and the Subcommittee over the Department's waiver of normal security investigation, one of the persons who had benefited from such waiver was a senior officer of The New York Times. Otepka's counsel argue that the publication of the alleged libel in 1970 was partly motivated by Otepka's opposition to such waiver in 1963. There is no evidence to support this argument; even if an inference could be drawn of such hostility on the part of some persons connected with The Times, plaintiff developed no evidence of such hostility in the depositions (which plaintiff offered in evidence) of the persons responsible for the publication of Sherrill's reply. There is no evidence which meets the test of liability set out in the Supreme Court cases cited and quoted in this opinion.

### Discussion

■ The evidence would support a conclusion, whatever one's ideological angle, that plaintiff was shabbily treated by the State Department, and that the signed articles and editorials in The New York Times about his qualifications for the position with the Subversive Activities Control Board were rough. However, there is no evidence that Sherrill or any of the people on The New York Times who were responsible for engaging Sherrill, for publishing the original article, for offering Sherrill the right to reply to Otepka's letter concerning the original article, or for deciding to publish Sherrill's reply to Otepka's comments, were in any way moved by prejudice against Otepka or by any desire to injure him. Certainly the evidence is far from showing that Sherrill or any of the people responsible for publishing Sherrill's reply either knew of the falsity of anything in the reply or had any serious doubt with respect to the truth of Sherrill's statement.

The evidence offered by plaintiff includes a denial of such knowledge by the three persons on the staff of The Times who were or might have been responsible for the publication of the reply. There is no evidence that Sherrill knew that anything in the reply was false or that he had any doubt as to its truth.[1]

■ The alleged libel was written by a professional journalist with experience in reporting political affairs, who relied on and cited a dated yet well regarded reference source. His inaccurate statement in a single sentence does not amount to "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers". Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (opinion of Justice Harlan).

It is true that in the hundred or so articles and editorials in the "clip file" of The Times, there were a number of articles which, if carefully read, would have shown that the original decision that Otepka be dismissed from the State Department for three reasons—release, declassification and mutilation of classified documents—had been modified by the Secretary to dismissal from his position in the Department for only one of those reasons, namely, release of such documents. But the controlling Supreme Court cases hold that failure to make such an investigation under generally similar circumstances does not amount to such reckless disregard of the truth as would permit recovery. New York Times Co. v. Sullivan, supra; Beckley Newspaper Corp. v. Hanks, supra; St. Amant v. Thompson, supra.

As in New York Times Co. v. Sullivan, "the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice". 376 U. S. at 288, 84 S.Ct. at 730.

---

1. Even if there were any such fault on the part of Sherrill, it is by no means clear that

The Times would be charged with such knowledge or fault on the part of a free-lance writer.

In this case, as in Beckley Newspaper Corp. v. Hanks, supra, nothing in the record " 'reveals the high degree of awareness of . . . probable falsity demanded by *New York Times* . . .' Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 129, it cannot be said on this record that any failure of petitioner to make a prior investigation constituted proof sufficient to present a jury question whether the statements were published with reckless disregard of whether they were false or not." 389 U.S. at 84–85, 88 S.Ct. at 200.

The motion of The New York Times Company for a directed verdict in its favor is hereby granted. An appropriate judgment order will be entered.