**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

STEVE WYNN,

Plaintiff-Appellee,

v.

LISA BLOOM; THE BLOOM FIRM,

Defendants-Appellants.

No. 20-15388

D.C. No.
2:18-cv-00609-JCM-NJK

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted March 10, 2021
Las Vegas, Nevada

Before: CLIFTON, NGUYEN, and BENNETT, Circuit Judges.

Defendants-Appellants Lisa Bloom and the Bloom Firm ("Bloom

Defendants") appeal from the district court's denial of their Special Motion to

Dismiss ("anti-SLAPP motion") brought pursuant to Nevada Revised Statute

§ 41.660 ("anti-SLAPP statute"). We have jurisdiction under the collateral order

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

doctrine,[1] review the district court's denial of Bloom Defendants' anti-SLAPP motion de novo, and affirm. *See Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017).

Wynn has demonstrated a genuine dispute of material fact as to whether Bloom Defendants acted with actual malice in publishing the Press Release.[2] The actual malice standard requires a showing that the defendant published a false or defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). To constitute reckless disregard, the defendant must have published a false statement with a "high degree of awareness of [its] probable falsity," *Garrison v.*

---

[1] Although we have consistently exercised jurisdiction over appeals from denials of anti-SLAPP motions brought under California law, *DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1015 (9th Cir. 2013), in 2012, we held that we did not have jurisdiction over an appeal from the denial of an anti-SLAPP motion brought under Nevada law because Nevada's anti-SLAPP statute did not expressly provide for an immediate right to appeal or establish immunity from suit, *Metabolic Rsch. Inc. v. Ferrell*, 693 F.3d 795, 801–02 (9th Cir. 2012). In 2013, Nevada amended its anti-SLAPP statute to provide for those rights. *See Delucchi v. Songer*, 396 P.3d 826, 830 & n.3 (Nev. 2017).

[2] "[W]hen an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply" to determine whether the plaintiff has established a probability of prevailing on the claim. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018); Nev. Rev. Stat. § 41.665(2).

*Louisiana*, 379 U.S. 64, 74 (1964), or "entertained serious doubts as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

The Press Release suggests that Wynn instructed—personally or through a third party—female ShowStoppers performers "to strip down to bras and panties, put on heels, and apply extra makeup so as to be sexually appealing" to him and that Wynn directly or indirectly retaliated against Angelina Mullins when she refused to comply. However, neither Mullins nor Samuel Cahn-Temes told Bloom Defendants that they heard Wynn give the instructions or had knowledge that the instructions came from Wynn. In fact, at her deposition, Mullins testified that although she assumed the instructions came from Wynn, she "made it clear" to Bloom Defendants that she had no personal knowledge that they did.

Furthermore, Mullins and Cahn-Temes gave Bloom Defendants reason to doubt that Wynn was responsible. Both Mullins's and Cahn-Temes's depositions highlighted the differences between New York Broadway and Los Angeles Commercial styles of performance and how performers' styles and professional experiences may have shaped their understandings of appropriate attire and behavior.[3] While Mullins's style was New York Broadway, choreographer

---

[3] Mullins noted that although most of the dancers were L.A.-based, the only people that corroborated her story were New York professionals.

Marguerite Derricks's style was Los Angeles Commercial. Mullins testified that she told the Bloom Firm, before the Press Release was issued, that other dancers that worked for Derricks in the past thought that it "seemed very normal . . . to be asked to wear what they were wearing for [Derricks] in this context" and that those performers' understanding of "what is acceptable for Broadway style show rehearsals and . . . go-go or burlesque dancing was sort of blurred." Cahn-Temes testified that he told Bloom Defendants that Mullins and Derricks had a "clash" of personalities and style—New York versus Los Angeles—and that Mullins was pushed to the back or removed from numbers, at least in part, due to that clash.[4]

Bloom Defendants chose to publish the Press Release inculpating Wynn after learning that none of the witnesses could confirm that Wynn played any role in giving the instructions and without considering alternative explanations or investigating further. Under these circumstances, though the result may not be

---

[4] Jordan Oslin, a Bloom Firm attorney, testified that he recalled Cahn-Temes telling him about the clash between the New York Broadway and Los Angeles Commercial styles but asserted that Cahn-Temes made it clear to him that the retaliation was a result of Mullins's refusal to sexualize herself for Wynn. Cahn-Temes's testimony contradicts Oslin's.

certain or perhaps even likely, a reasonable jury could find that Bloom Defendants acted with actual malice in publishing the Press Release.

    **AFFIRMED.**